**[J-82A-2013 and J-82B-2013]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 668 CAP |
| | : |
| Appellant | : Appeal from the Order entered on |
| | : 09/28/2012 in the Court of Common Pleas, |
| | : Criminal Division of Philadelphia County at |
| v. | : No. CP-51-CR-0823621-1984, granting a |
| | : Stay of Execution |
| | : |
| TERRANCE WILLIAMS, | : SUBMITTED:   September 18, 2013 |
| | : |
| Appellee | : |

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 669 CAP |
| | : |
| Appellant | : Appeal from the Order entered on |
| | : 09/28/2012 in the Court of Common Pleas, |
| | : Criminal Division of Philadelphia County at |
| v. | : No. CP-51-CR-0823621-1984 |
| | : |
| | : SUBMITTED:   September 18, 2013 |
| TERRANCE L. WILLIAMS, | : |
| | : |
| Appellee | : |

**OPINION**

**MR. JUSTICE EAKIN**                    **DECIDED:   December 15, 2014**

The Commonwealth appeals from the order granting a stay of execution, vacating appellee's death sentence, and awarding a new penalty hearing under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  We vacate the stay of execution and the grant of a new penalty phase, and reinstate the sentence of death.

Appellee was sentenced to death after being convicted of the robbery and murder of Amos Norwood February 3, 1986, his second murder conviction. A detailed account of the crime is set forth in our opinion on direct appeal. See Commonwealth v. Williams, 570 A.2d 75, 77-79 (Pa. 1990). Suffice it to say, appellee and his co-conspirator, Marc Draper, took Norwood to a graveyard, tied him with his own clothes, and beat him to death with a tire iron — appellee returned the next day and set fire to the corpse. At trial, appellee testified that Draper and another individual committed the crime; he claimed he was elsewhere at the time and uninvolved. He testified he did not know the victim, had never seen him before, and had no reason to be angry with him or wish to harm him. This Court affirmed the judgment of sentence February 8, 1990, id., at 84, and appellee did not seek certiorari. He filed a timely PCRA petition March 24, 1995.

At the 1998 PCRA hearing, now represented by the Federal Community Defenders Office (FCDO), appellee abandoned his trial testimony and argued Norwood engaged in homosexual acts with him, and as set forth below, presented evidence supporting this claim. The PCRA court denied relief, and this Court affirmed. Commonwealth v. Williams, 863 A.2d 505, 523 (Pa. 2004). Appellee filed a second PCRA petition February 18, 2005, which was dismissed as untimely. This Court affirmed. Commonwealth v. Williams, 909 A.2d 297 (Pa. 2006) (per curiam). Appellee filed a third PCRA petition June 1, 2005, which was dismissed as untimely, and we affirmed. Commonwealth v. Williams, 962 A.2d 609 (Pa. 2009) (per curiam).

While that PCRA appeal was pending before this Court, appellee filed a federal habeas corpus petition December 19, 2005, which was denied. The Third Circuit affirmed. Williams v. Beard, 637 F.3d 195, 238 (3d Cir. 2011). In his federal appeal, appellee contended trial counsel was ineffective for failing to present evidence he was psychologically damaged by years of sexual abuse, which infused him with rage toward

men who made sexual advances toward him; appellee argued Norwood was one of these men and had been sexually abusing him since the age of 13. Appellee petitioned the United States Supreme Court for certiorari, which was denied. Williams v. Wetzel, 133 S. Ct 65 (2012) (per curiam).

On January 9, 2012, the FCDO visited Draper, who was serving a life sentence at SCI-Frackville. That same day, Draper signed an affidavit declaring he told detectives and the prosecution prior to trial that Norwood was a homosexual and was in a relationship with appellee. The affidavit also claimed the prosecution "wanted the motive to be a robbery and kept coming back to that. That's how they wanted me to testify, that it was a robbery." Draper's Affidavit, 1/9/12, at 4. The FCDO revisited Draper March 1, 2012, obtaining another affidavit with similar declarations.

Appellee then filed this facially untimely PCRA petition March 9, 2012, his fourth state petition for collateral review. On July 27, 2012, he filed a "Supplemental Petition for Post Conviction Relief and Notice of Filing Additional Evidence in Support of Stay of Execution," although no execution warrant had been signed. An execution warrant was subsequently issued August 8, 2012, setting the execution for October 3, 2012. Appellee filed a "Renewed Motion for Stay of Execution" August 28, 2012, and the Commonwealth filed a response September 7, 2012. On September 6, 2012, appellee filed a motion for discovery, requesting the production of exculpatory information from the Commonwealth "as well as any reports or notes made concerning Norwood's sexual relationship or sexual abuse of [appellee] or any other child under the age of 18." Appellee's Motion for Discovery, 9/6/12, at 5-6.

On September 10, 2012, the PCRA court heard argument on the pleadings to determine whether the petition warranted an evidentiary hearing. The court gave appellee time to obtain and submit additional information from Draper, which led to his

third affidavit, dated September 11, 2012. On September 14, the court heard additional argument and ordered an evidentiary hearing, which began September 20; only Draper and the trial prosecutor testified. On Saturday, September 22, the court ordered the Commonwealth to produce trial files and Philadelphia Police Department files and allowed both parties to review those files.[1] On September 24, documents from these files were offered and admitted into evidence, and the PCRA court entered 11 exhibits sua sponte. See Exhibit List, 9/20/12. The court then directed appellee to amend his PCRA petition; on September 28, appellee filed an "Amendment and Supplement to Petition for Post-Conviction Relief," requesting relief because the Commonwealth had given "sanitized" witness statements to the defense. The same afternoon, the court ruled there was a Brady[2] violation because that which was missing from original discovery suggested Norwood may have been a "homosexual ephebophiliac." PCRA Court Opinion, 11/27/12, at 12-13 (citations omitted).[3]

The PCRA court also concluded appellee's fourth PCRA petition met the "governmental interference" exception to the PCRA's timeliness requirement, 42 Pa.C.S. § 9545(b)(1)(i),[4] though it did not meet the "newly-discovered evidence" exception, id., §

---

[1] The court's order included files for both the Norwood murder and the murder of Herbert Hamilton. Both murders had the same trial prosecutor, the same defendant (appellee), and the same key witness (Draper). In the Hamilton murder, appellee was receiving money from Hamilton in exchange for sex; appellee murdered Hamilton when he threatened to expose this relationship. Although the charge was first degree murder, the jury convicted appellee of third degree murder, about one year before the Norwood trial.

[2] Brady v. Maryland, 373 U.S. 83 (1963).

[3] The PCRA court defined "homosexual ephebophilia" as a psychological term for the attraction to "young men," both adults and adolescents. See id., at 13 n.32.

[4] Subsection (b)(1)(i) provides an untimely PCRA petition falls within an exception if the petitioner proves: "the failure to raise the claim previously was the result of interference by (continued…)

9545(b)(1)(ii).[5]   The court ordered a stay of execution pursuant to § 9545(c)(2),[6] finding appellee exceeded the "strong likelihood" threshold and demonstrated actual success on the merits of his claim regarding the penalty phase.   The court held the Commonwealth violated Brady and found appellee identified a specific claim, Norwood's homosexual ephebophilia, which he was unable to discover or develop due to interference by the Commonwealth.   The interference consisted of withholding or "sanitizing" three specific pieces of evidence: a statement by Norwood's wife, a statement by the pastor of appellee's church, and notes made by the prosecutor.

The first statement involved a story Norwood's wife told police, which was omitted from the 1984 police activity sheet.   She said Norwood once woke her at 2 a.m. and asked her for money while a young male stood in the hall outside their bedroom.   She saw Norwood load stereo equipment into his car and drive away with the young male. She told police she believed this to be a kidnapping; when Norwood returned home around 9 a.m., he said he was abducted but escaped by using psychology on his captors. When his wife tried to call the police, Norwood asked her to avoid their involvement.

The second statement was from appellee's pastor, who was also a friend of Norwood.   The pastor told police Norwood worked with and counseled young males in

---

(…continued)
government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States[.]"   Id.

[5] Subsection (b)(1)(ii) provides an exception for an untimely PCRA petition if the petitioner proves: "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence[.]"   Id.

[6] Subsection (c)(2) states no stay may be issued unless a PCRA petition meeting all requirements of this subchapter of the PCRA has been filed and is pending, and the petitioner makes "a strong showing of likelihood of success on the merits."   Id., § 9545(c)(2).

the church for many years. Omitted from the 1984 activity sheet was the pastor's suspicion that Norwood may have been a homosexual, and that five years earlier, the pastor received a complaint from a mother alleging Norwood propositioned her 17-year-old son for sex. The pastor also repeated for police the "kidnapping" story told by Norwood's wife — this was included with the pastor's statements in the 1984 police activity sheet, which had been disclosed to the defense.

The court also found the Commonwealth failed to disclose handwritten notes by the trial prosecutor, purportedly recounting an instance of Norwood's behavior toward a teenage male, which would establish the prosecution's awareness of Norwood's homosexual proclivities. The court stated, had such evidence been disclosed to the defense, trial counsel would have been able to challenge the Commonwealth's sympathetic portrayal of Norwood. The court concluded the inability to portray an unsympathetic victim was enough to undermine one's confidence the jury would have returned the same verdict of death.[7]

Finding appellee exercised due diligence, the court concluded he did not know this evidence existed until his co-conspirator executed an affidavit in January, 2012, declaring a possible motive for the crime, i.e., rage over being sexually abused by Norwood. Appellee timely filed his PCRA petition within 60 days of learning the substance of Draper's affidavit. Furthermore, the court noted appellee could not have known the

---

[7] The court also stated the Commonwealth interfered with appellee's Brady claim by "disput[ing] the existence of information in [its] files about [] Norwood's homosexual ephebophilia" when the Commonwealth represented to the 1998 PCRA court that the only evidence involved in the case was appellee's knowledge that Norwood was a homosexual and his plan to extort money from Norwood but mentioned nothing about the additional "homosexual ephebophilia" evidence. PCRA Court Opinion, 11/27/12, at 15-17. The court added a supplemental opinion to its PCRA opinion, describing additional instances that led it to conclude the prosecution exhibited "gamesmanship." See id. app., at 1-15.

Commonwealth interfered with his ability to present evidence of Norwood's homosexual ephebophilia until the underlying evidence was uncovered during the hearing held as a result of Draper's affidavit; therefore, appellee timely filed the amendment and supplement to his PCRA petition in order to particularize his Brady claim just three days after government files were opened. Accordingly, the court concluded appellee met his burden under 42 Pa.C.S. § 9545(b)(1)(i), and subsection (b)(2), so it had jurisdiction to grant relief. Finding appellee established his Brady claim, the court held he was entitled to a new penalty hearing. The court denied relief regarding the guilt phase. The Commonwealth filed this appeal, raising two issues for our review regarding the timeliness of appellee's fourth PCRA petition and the merits of his Brady claim.[8]

Our standard of review of the PCRA court's grant of relief is clear: we examine whether the court's findings are supported by the record and whether its conclusions of law are free from legal error. Commonwealth v. Colavita, 993 A.2d 874, 886 (Pa. 2010). All PCRA petitions, "including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final" unless an exception to timeliness applies. 42 Pa.C.S. § 9545(b)(1). "The PCRA's time restrictions are jurisdictional in nature. Thus, [i]f a PCRA petition is untimely, neither this Court nor the [PCRA] court has jurisdiction over the petition. Without jurisdiction, we simply do not have the legal

---

[8] The Commonwealth's issues, set forth verbatim, are:

> I. Was [appellee]'s fourth PCRA petition, in which he alleged a violation of Brady[] based on the non-disclosure of information he had known since before trial, untimely?

> II. In any event, was [appellee]'s Brady claim meritless where the information in question would not have been reasonably likely to change the outcome, had no apparent exculpatory value, and had been known all along by [him]?

Commonwealth's Brief, at 3.

authority to address the substantive claims." Commonwealth v. Chester, 895 A.2d 520, 522 (Pa. 2006) (first alteration in original) (internal citations and quotation marks omitted). As timeliness is distinct from the merits of the underlying claims, we must first determine whether appellee's PCRA petition was timely filed in order to decide whether this Court has legal authority to address its substantive claims. See Commonwealth v. Stokes, 959 A.2d 306, 310 (Pa. 2008) (consideration of Brady claim separate from consideration of its timeliness).

This, appellee's fourth PCRA petition, was untimely on its face, as it was filed over 20 years after his judgment of sentence became final. The PCRA petitioner has the burden of proving an untimely petition falls within an exception outlined in § 9545(b)(1). See Commonwealth v. Hawkins, 953 A.2d 1248, 1253 (Pa. 2008) ("[I]t is the [petitioner]'s burden to allege and prove that one of the timeliness exceptions applies." (citation omitted)). Furthermore, any PCRA petition filed under a timeliness exception must be filed within 60 days of when the petition could have first been presented. 42 Pa.C.S. § 9545(b)(2). "'[T]he 60-day rule requires a petitioner to plead and prove that the information on which he relies could not have been obtained earlier, despite the exercise of due diligence.'" Commonwealth v. Albrecht, 994 A.2d 1091, 1094 (Pa. 2010) (quoting Stokes, at 310).

Although a Brady violation might fall within the "governmental interference" exception, § 9545(b)(1)(i) nonetheless requires a petitioner to plead and prove: (1) the failure to previously raise the claim was the result of interference by government officials and (2) the information on which he relies could not have been obtained earlier with the exercise of due diligence. Commonwealth v. Abu-Jamal, 941 A.2d 1263, 1268 (Pa. 2008) (citation omitted). The merits of a Brady claim need not be addressed until it is established that the instant petition was timely filed. Stokes, at 310. Thus, the proper

questions for our review are whether the Commonwealth interfered with appellee's ability to present a claim that Norwood was a homosexual with a sexual attraction to teenage males, and whether appellee was duly diligent in obtaining such information.

The PCRA court held it had jurisdiction under the "governmental interference" exception to the PCRA's time-bar, concluding the alleged Brady violations posited by appellee met the requirements of 42 Pa.C.S. § 9545(b)(1)(i). The Commonwealth contends appellee's PCRA petition failed to establish this exception, as appellee would have known well before trial of any sexual relationship or abuse between Norwood and himself. In fact, the Commonwealth argues, if anyone knew about Norwood's homosexual proclivities toward teenage males, it was appellee himself. The Commonwealth points to the evidence of appellee's statements during the murder, taunting Norwood for "liking boys," and appellee's plan to extort Norwood by threatening to expose his homosexual activity.

Further, the Commonwealth contends appellee not only could have presented evidence of ephebophilia much sooner, but points out appellee did present just such a claim during his first PCRA proceedings in 1998, where he offered testimony from several witnesses alleging Norwood sexually abused him. The Commonwealth also posits that appellee's instant PCRA petition admitted he knew about Norwood's homosexual tendencies years before the murder. Since appellee already knew about this alleged material evidence, the Commonwealth contends any "sanitization" of evidence by the prosecution does not amount to a Brady violation. Accordingly, the Commonwealth asserts, appellee did not prove the timeliness exception applies, and the PCRA court was without jurisdiction to rule on appellee's petition, much less grant a stay of execution and a new penalty phase.

The Commonwealth also suggests the PCRA court attempted to circumvent a valid death sentence and undermine the integrity of this Court's ruling in appellee's first PCRA appeal. The Commonwealth refers to the ordering of what amounted to additional discovery to supplement appellee's inadequate petition, the court's lengthy examination of the trial prosecutor after PCRA counsel finished his examination, and the admission of "court exhibits" sua sponte, later basing its "governmental interference" decision on one of its own exhibits. In sum, the Commonwealth contends the PCRA court "went to great lengths to expand the record, to reshape [appellee]'s claim, and to limit the Commonwealth." Commonwealth's Reply to Defendant's Response to Emergency Application to Lift Illegal Stay of Execution, 10/2/12, at 12. The Commonwealth, therefore, requests we vacate the stay of execution and the grant of a new penalty phase.

Appellee argues the PCRA court's timeliness findings were supported by the record and devoid of legal error. While appellee admits he had prior knowledge of Norwood's sexual orientation, he contends such prior knowledge is critically different from evidence of homosexual ephebophilia and sexual abuse of other teenage males. He distinguishes the failure to present the defense of rage at trial, his 1998 ineffectiveness claim, from the inability to present Norwood as unsympathetic, and repeats that knowledge of homosexuality is not the same as knowledge of homosexual ephebophilia, insofar as it relates to the ability to paint an unsympathetic picture of Norwood.

Appellee argues he met § 9545(b)(1)(i)'s exception because the Commonwealth interfered with his ability to proffer this particular Brady claim, and that he exercised due diligence by presenting the claim within 60 days of obtaining the facts on which the claim was based. Further, appellee asserts a PCRA petitioner's previous knowledge of a fact applies only to § 9545(b)(1)(ii)'s newly-discovered evidence exception, not § 9545(b)(1)(i), alleging the Commonwealth is required to disclose evidence in its

possession even if the defense has previous knowledge or other information about that fact, and the failure to disclose such evidence violates Brady, constituting governmental interference with the ability to present a Brady claim.

Our examination of the three omissions alleged leads to the inescapable conclusion that appellee is not entitled to relief. The missing reports were found to be relevant to Norwood's character, but the failure to explore or exploit that character was not a result of governmental interference — there is abundant evidence appellee knew of Norwood's homosexuality and conduct with teenage boys well before trial, sufficient to present him as unsympathetic before the jury. Appellee himself was a teenage male admittedly engaged in homosexual acts with Norwood. Although he denied any involvement in the crime at trial, evidence included his plan to extort Norwood by threating to expose him for being a homosexual, and statements in which Draper and appellee taunted Norwood for "liking boys" while they were beating him. N.T. Trial, 1/22/86, at 667-68; N.T. Trial, 1/23/86, at 813-14; see also N.T. PCRA Hearing, 9/20/12, at 219; N.T. PCRA Hearing Vol. 2, 9/24/12, at 13. Draper testified at trial that appellee told him Norwood was a homosexual. N.T. Trial, 1/23/86, at 814. We agree with the courts that have previously considered appellee's claims based on sexual orientation — there is no reasonable conclusion that the result of a trial for this horrific crime would have been different had the missing information been provided as appellee would have liked.

Further, evidence offered at appellee's first PCRA hearing in 1998 demonstrated the extent of available knowledge of Norwood's sexual appetites. At that proceeding, counsel offered three expert witnesses, all of whom testified appellee and Norwood were in a homosexual relationship in which appellee was abused by Norwood; they suggested the murder was an "enraged killing" in response to the sexual abuse. See N.T. PCRA Hearing, 4/8/98, at 106, 115, 156-59, 186; N.T. PCRA Hearing, 4/9/98, at 360-61, 375-76;

N.T. PCRA Hearing, 4/13/98, at 540, 542-44, 551-54, 569-70.   Additionally, appellee's high school teacher, who was also a private psychotherapist, testified Norwood molested young boys, including appellee, and he learned this information from several people in early 1997.   N.T. PCRA Hearing, 4/8/98, at 226-33.   Appellee's friend, Donald Fisher, who was also in a homosexual relationship with appellee for approximately five years, testified appellee and Norwood began a homosexual relationship when appellee was approximately 15 years old, which lasted a few years, and Norwood was abusive, liked to inflict pain, and enjoyed having sex with teenage males.   N.T. PCRA Hearing, 4/13/98, at 597, 602-05, 617.   Fisher also testified appellee would engage in homosexual acts with Norwood for money, alcohol, and other gifts.   Id., at 617-18.   Fisher learned this information not only from observing the relationship between appellee and Norwood but also because appellee told Fisher.   Id.   Additionally, the defense stated throughout the hearings that its mitigation witnesses were offered to show Norwood molested young males and to demonstrate trial counsel's ineffectiveness in investigating the homosexual relationship between appellee and Norwood and the abuse involved in that relationship. See N.T. PCRA Hearing, 4/8/98, at 235-37; N.T. PCRA Hearing, 4/13/98, at 603.

Appellee's prior knowledge was also evident at his federal habeas corpus proceeding, during which he alleged Norwood was a closeted homosexual from whom he could extort cash by threatening to expose Norwood's secret to his wife.   Williams, 637 F.3d at 200.   Analyzing the record from appellee's first PCRA proceeding, the Third Circuit noted appellee and Norwood began their homosexual relationship when appellee was approximately 13 years old.   Id., at 229.   The court stated Norwood was physically abusive toward appellee, once allegedly beating him with a belt.   Id., at 229-30.   The federal district court also elicited testimony from appellee's first PCRA proceeding showing Norwood was a homosexual with whom appellee had sex in exchange for

money, drugs, and gifts.  See Williams v. Beard, 2007 U.S. Dist. LEXIS 41310, at *106 n.32 (E.D. Pa. May 8, 2007).

The PCRA court itself acknowledged appellee's arguments from the 1998 PCRA hearing supported his prior knowledge, stating appellee "elicited evidence from [] Fisher that [] Norwood was very degrading and he liked to have sex with kids.  However, the current claim does not rest solely upon that evidence."  See N.T. PCRA Hearing, 9/28/12, at 21.  The court also noted the defense, at the time of trial, indeed had information suggesting Norwood was a homosexual — a statement from a witness disclosing appellee told him Norwood "'was a homosexual and was the type to pay people.'"  Id., at 27-28.  Appellee's PCRA counsel also referenced his prior knowledge at the hearings.  See N.T. PCRA Hearing, 9/10/12, at 24 ("[W]e tried to present in prior proceedings evidence about the sexual abuse by [] Norwood of [appellee.]").

And quite tellingly, Draper's affidavits established he knew appellee and Norwood were in a homosexual relationship — "[appellee] had also told me that Norwood was gay" and during the murder, "[appellee] was yelling 'so you like boys, so you like boys' as he hit Norwood" — and appellee told Draper the murder was about the homosexual relationship.  Draper's Affidavit, 9/11/12, at 2-4.  Draper confirmed appellee's prior knowledge of Norwood's homosexual proclivities repeatedly in his PCRA testimony.  See N.T. PCRA Hearing, 9/20/12, at 219; N.T. PCRA Hearing Vol. 1, 9/24/12, at 88, 93, 96; N.T. PCRA Hearing Vol. 2, 9/24/12, at 12-13.

The evidence alleged to comprise the Brady violation does not include information unknown to appellee, or information he would have been unable to find on his own.  The "kidnapping" story told by Norwood's wife indicates that a probably untruthful story was told to her, but nothing more.  The PCRA court apparently read between the lines and presumed the story was a lie to hide Norwood's homosexuality from his wife.  And

although this story was omitted from the wife's statements in the 1984 police activity sheet, it was disclosed with the pastor's statements in the same sheet. That is, appellee was already aware of this story, whatever its value, through other means. See Reverend's Disclosed Statement, Exhibit C-2, PCRA Hearing, 9/20/12, at 5. Since appellee had it, the government did not interfere with his ability to obtain it.

The pastor's suggestion that he suspected Norwood may have been a homosexual would hardly have surprised appellee, who knew that for years. The government did not keep appellee from ferreting out the reverend, even if his opinion might have been admissible. The pastor's report that he once received a complaint alleging Norwood propositioned a teenage male would have been equally unsurprising. These allegations confirmed what appellee already knew — Norwood was a homosexual with attraction toward teenage males, like himself.[9] There simply is no surprise in this revelation, no new information or insinuation that only now suggests Norwood might be made to look "unsympathetic."

The third "interference" involves nondisclosure of handwritten notes of the trial prosecutor; the PCRA court concluded they recounted a specific instance of homosexual ephebophilia. In toto, the notes read, "[N]ot true — Mrs. House — son in play — Ronald — 16 yrs.[sic] — touched on privates — I don't do that — nobody wd [sic] have to know — brought boy home [and] asked him not to say anything @ [sic] the — he stopped coming to church — disappeared — never verified it — 29 yrs. [sic] — 1st X [sic] — never heard from others @ [sic] possible incidents." See Exhibit Court-2, PCRA Hearing, 9/20/12, at

---

[9] The reverend refused to make these statements in writing but related them to police in confidence. He stated, "[H]e himself handled the matter internally and the complaint never went any further than that." See Police Activity Sheet, Exhibit P-24, PCRA Hearing, 9/20/12.

2.  The court <u>sua</u> <u>sponte</u> admitted these cryptic notes into evidence and used them to question the trial prosecutor.[10]

These murky notes, if decipherable with any degree of confidence, do not indicate the origin or veracity of their content; they do not indicate whether the notes were written during a witness interview, much less who was being interviewed.   Indeed, they start with the notation "not true."   They do not mention Norwood, whose connection to the notes we are asked to insinuate.   One could infer they involve the incident omitted from the pastor's statements in the 1984 police activity sheet, where a mother told of Norwood's propositioning her teenage son.   However, next to appellee's own evidence at the 1998 hearing, it adds little or nothing whatsoever to the information available and already presented.   The ability to pursue the mitigating tactic of making Norwood appear unsympathetic was not created by these notes.

Lastly, we note a measure of bootstrapping in appellee's argument.   It is difficult to conclude appellee learned something new from Draper's latest affidavit, as Draper's information was derived from appellee's own statements to Draper prior to and at the time of the murder.   Further, Draper's suggestion that appellee was enraged at the time of the murder depends on Norwood's prior abuse of appellee, which necessarily establishes appellee's knowledge of Norwood's proclivities before trial.   Thus, any failure to previously raise this claim was not the result of governmental interference.   <u>See</u> <u>Commonwealth v. Grant</u>, 813 A.2d 726, 730 (Pa. 2002) ("[N]o <u>Brady</u> violation occurs where parties had equal access to the information or if the defendant knew or could have

---

[10] Although the Commonwealth contends the PCRA court violated Pa.R.Crim.P. 902(E)(1) in the "Statement of the Case" section of its brief, <u>see</u> Commonwealth's Brief, at 19, the Commonwealth does not raise a discovery issue on appeal; thus, we will not address discovery matters.   <u>See</u> Pa.R.A.P. 302(a).

uncovered such evidence with reasonable diligence." (citation omitted)); see also Commonwealth v. Morris, 822 A.2d 684, 696-97 (Pa. 2003).

Like appellee's failed effort to establish a timeliness exception, his Brady claim provides no grounds for PCRA relief because the claim is inapposite to the necessary materiality inquiry. The United States Supreme Court has never held Brady materiality is measured in terms of "effects on the defense strategy." See Commonwealth v. Weiss, 81 A.3d 767, 810-11 (Pa. 2013) (Castille, C.J., concurring, joined by Eakin, J.). Further, Brady does not permit a defendant to shield himself from his prior perjury at trial. See id., at 811-13.

Appellee's Brady theory suggested that had he received additional information about Norwood's homosexual proclivities, his defense would have learned his actual motive for the murder, i.e., rage over being sexually abused by Norwood, which, in turn, would possibly lead to a new strategy where appellee does not perjure himself and Norwood is portrayed unsympathetically. Yet, at the time of trial, appellee was aware of potential witnesses and information that would establish Norwood's homosexual attraction to teenage males. Appellee could have used his prior knowledge and his counsel's due diligence to obtain additional information and witnesses to support a different trial theory than that presented. He could have argued Norwood's homosexual proclivities developed into sexual abuse, leading to rage and ultimate murder of Norwood. He could also have created a portrait of Norwood consistent with that now proffered. However, appellee chose not to do so.

Instead, appellee perjured himself at trial, testifying he did not know the victim, had never seen him before, took no part in the murder, and had no reason to be angry with him or wish to harm him. The defense he chose to present disclaimed knowledge of Norwood, which is antithetical to what he knew and could have presented — evidence

that showed Norwood as a molester, which may have led to establishing a motive of rage, or evidence allowing him to depict Norwood as an unsavory character and sexual predator. Given the choice of defense, such strategies were not relevant.[11] Given the details of appellee's crime, showing the jury the victim was "unsympathetic" was not a plan that was likely to cause reciprocal sympathy for the man who bludgeoned him and incinerated his body. Regardless, this alleged "sanitized information" claim, coupled with the possible effect on appellee's defense strategy, lacks any basis under Brady, as it is neither exculpatory nor material. See Weiss, at 810-13 (Castille, C.J., concurring, joined by Eakin, J.). In sum, the Commonwealth did not obstruct appellee's ability to present Norwood as unsympathetic. Appellee had prior knowledge of the information on which he based his Brady claim, and could have presented the claim much sooner — prior to trial or at any time over the last 20 years. Because appellee's theory was built on perjury, and the information on which he relied was not exculpatory, the PCRA court erred in finding his claim material under Brady. Accordingly, the record does not support the PCRA court's finding appellee established his burden of proof regarding the "governmental interference" exception. See Abu-Jamal, at 1268 (citation omitted). Because the PCRA court was thus without jurisdiction to consider the merits of this petition, see Hawkins, at 1252 (citations omitted), we vacate the court's order, dismiss this petition as time-barred, and reinstate the judgment of sentence of death. The Prothonotary is directed to transmit the complete record in this case to the Governor pursuant to 42 Pa.C.S. § 9711(i).

Order vacated; petition dismissed; judgment of sentence reinstated.

---

[11] Trial counsel indicated at a hearing on appellee's post-sentence motions that he was left with using appellee's youth as a potential mitigating factor — since appellee provided him little, if any, assistance, he was frustrated in efforts to present a compelling group of character witnesses on his behalf. See N.T. Post-Sentence Motions, 4/24/87, at 21-27.

Jurisdiction relinquished.

Mr. Chief Justice Castille and Messrs. Justice Baer and Stevens join the opinion.

Mr. Chief Justice Castille files a concurring opinion.

Mr. Justice Saylor and Madame Justice Todd concur in the result.