Justice THOMAS, dissenting.
The Court concludes that it violates the Due Process Clause for the chief justice of the Supreme Court of Pennsylvania, a former district attorney who was not the trial prosecutor in petitioner Terrance Williams' case, to review Williams' fourth petition for state postconviction review. Ante, at 1906 - 1907, 1910. That conclusion is flawed. The specter of bias alone in a judicial proceeding is not a deprivation of due process. Rather than constitutionalize every judicial disqualification rule, the Court has left such rules to legislatures, bar associations, and the judgment of individual adjudicators. Williams, moreover, is not a criminal defendant. His complaint is instead that the due process protections in his state postconviction proceedings-an altogether new civil matter, not a continuation of his criminal trial-were lacking.
*1915 Ruling in Williams' favor, the Court ignores this posture and our precedents commanding less of state postconviction proceedings than of criminal prosecutions involving defendants whose convictions are not yet final. I respectfully dissent.
I
A reader of the majority opinion might mistakenly think that the prosecution against Williams is ongoing, for the majority makes no mention of the fact that Williams' sentence has been final for more than 25 years. Because the postconviction posture of this case is of crucial importance in considering the question presented, I begin with the protracted procedural history of Williams' repeated attempts to collaterally attack his sentence.
A
Thirty-two years ago, Williams and his accomplice beat their victim to death with a tire iron and a socket wrench. Commonwealth v. Williams, 524 Pa. 218, 222-224, 570 A.2d 75, 77-78 (1990)(Williams I ). Williams later returned to the scene of the crime, a cemetery, soaked the victim's body in gasoline, and set it on fire. Id., at 224, 570 A.2d, at 78. After the trial against Williams commenced, both the Chief of the Homicide Unit and the District Attorney, Ronald Castille, approved the trial prosecutor's decision to seek the death penalty by signing a piece of paper. See App. 426. That was Castille's only involvement in Williams' criminal case. Thereafter, a Pennsylvania jury convicted Williams of first-degree murder, and he was sentenced to death. Williams I, 524 Pa., at 221-222, 570 A.2d, at 77. The Supreme Court of Pennsylvania affirmed his conviction and sentence. Id., at 235, 570 A.2d, at 84.
Five years later, Williams filed his first petition for state postconviction relief. Commonwealth v. Williams, 581 Pa. 57, 65, 863 A.2d 505, 509 (2004)(Williams II ). The postconviction court denied the petition. Id., at 65, 863 A.2d, at 510. Williams appealed, raising 23 alleged errors. Ibid. The Supreme Court of Pennsylvania, which included Castille in his new capacity as a justice of that court, affirmed the denial of relief. Id., at 88, 863 A.2d, at 523. The court rejected some claims on procedural grounds and denied the remaining claims on the merits. Id., at 68-88, 863 A.2d, at 511-523. The court's lengthy opinion did not mention the possibility of Castille's bias, and Williams apparently never asked for his recusal.
Then in 2005, Williams filed two more petitions for state postconviction relief. Both petitions were dismissed as untimely, and the Supreme Court of Pennsylvania affirmed. Commonwealth v. Williams, 589 Pa. 355, 909 A.2d 297 (2006)(per curiam ) (Williams III ); Commonwealth v. Williams, 599 Pa. 495, 962 A.2d 609 (2009)(per curiam ) (Williams IV ). Castille also presumably participated in those proceedings, but, again, Williams apparently did not ask for him to recuse.[1]
Williams then made a fourth attempt to vacate his sentence in state court in 2012. 629 Pa. 533, ----, 105 A.3d 1234, 1237 (2014)(Williams VI ). Williams alleged that the prosecution violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose exculpatory evidence. The allegedly exculpatory evidence was information about Williams' motive. According to Williams, the prosecution should have disclosed to *1916 his counsel that it knew that Williams and the victim had previously engaged in a sexual relationship when Williams was a minor. Williams VI, --- Pa., at ----, 105 A.3d, at 1237.[2] The state postconviction court agreed and vacated his sentence. Id., at ----, 105 A.3d, at 1239.
The Commonwealth appealed to the Supreme Court of Pennsylvania. Only then-the fourth time that Williams appeared before Castille-did Williams ask him to recuse. App. 181. Castille denied the recusal motion and declined to refer it to the full court. Id ., at 171. Shortly thereafter, the court vacated the postconviction court's order and reinstated Williams' sentence. The court first noted that Williams' fourth petition "was filed over 20 years after [Williams'] judgment of sentence became final" and "was untimely on its face." Williams VI, --- Pa., at ----, 105 A.3d, at 1239. The court rejected the trial court's conclusion that an exception to Pennsylvania's timeliness rule applied and reached "the inescapable conclusion that [Williams] is not entitled to relief." Id., at ----, 105 A.3d, at 1239-1241; see also id., at ----, 105 A.3d, at 1245(Castille, J., concurring) (writing separately "to address the important responsibilities of the [state postconviction] trial courts in serial capital [state postconviction] matters").
Finally, Williams filed an application for reargument. App. 9. The court denied the application without Castille's participation. Id., at 8. Castille had retired from the bench nearly two months before the court ruled.
B
As this procedural history illustrates, the question presented is hardly what the majority makes it out to be. The majority incorrectly refers to the case before us and Williams' criminal case (that ended in 1990) as a decades-long "single case" or "matter." Ante, at 1906; see also ante, at 1906 - 1907. The majority frames the issue as follows: whether the Due Process Clause permits Castille to "ac[t] as both accuser and judge in [Williams'] case." Ante, at 1905. The majority answers: "When a judge has served as an advocate for the State in the very case the court is now asked to adjudicate, a serious question arises as to whether the judge, even with the most diligent effort, could set aside any personal interest in the outcome." Ante, at 1906 (emphasis added). Accordingly, the majority holds that "[w]here a judge has had an earlier significant, personal involvement as a prosecutor in a critical decision in the defendant's case, the risk of actual bias in the judicial proceeding rises to an unconstitutional level." Ante, at 1910 (emphasis added). That is all wrong.
There has been, however, no "single case" in which Castille acted as both prosecutor and adjudicator. Castille was still *1917 serving in the district attorney's office when Williams' criminal proceedings ended and his sentence of death became final. Williams' filing of a petition for state postconviction relief did not continue (or resurrect) that already final criminal proceeding. A postconviction proceeding "is not part of the criminal proceeding itself" but "is in fact considered to be civil in nature," Pennsylvania v. Finley, 481 U.S. 551, 556-557, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), and brings with it fewer procedural protections. See, e.g., District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 68, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009).
Williams' case therefore presents a much different question from that posited by the majority. It is more accurately characterized as whether a judge may review a petition for postconviction relief when that judge previously served as district attorney while the petitioner's criminal case was pending. For the reasons that follow, that different question merits a different answer.
II
The "settled usages and modes of proceeding existing in the common and statute law of England before the emigration of our ancestors" are the touchstone of due process. Tumey v. Ohio, 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927); see also Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 277, 15 L.Ed. 372 (1856). What due process requires of the judicial proceedings in the Pennsylvania postconviction courts, therefore, is guided by the historical treatment of judicial disqualification. And here, neither historical practice nor this Court's case law constitutionalizing that practice requires a former prosecutor to recuse from a prisoner's postconviction proceedings.
A
At common law, a fair tribunal meant that "no man shall be a judge in his own case." 1 E. Coke, Institutes of the Laws of England § 212, *141a ("[A ]liquis non debet esse judex in propiâ causâ "). That common-law conception of a fair tribunal was a narrow one. A judge could not decide a case in which he had a direct and personal financial stake. For example, a judge could not reap the fine paid by a defendant. See, e.g., Dr. Bonham's Case, 8 Co. Rep. 107a, 114a, 118a, 77 Eng. Rep. 638, 647, 652 (C.P. 1610) (opining that a panel of adjudicators could not all at once serve as "judges to give sentence or judgment; ministers to make summons; and parties to have the moiety of the forfeiture"). Nor could he adjudicate a case in which he was a party. See, e.g., Earl of Derby's Case, 12 Co. Rep. 114, 77 Eng. Rep. 1390 (K.B. 1614). But mere bias-without any financial stake in a case-was not grounds for disqualification. The biases of judges "cannot be challenged," according to Blackstone, "[f]or the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." 3 W. Blackstone, Commentaries on the Laws of England, 361 (1768) (Blackstone); see also, e.g., Brookes v. Earl of Rivers, Hardres 503, 145 Eng. Rep. 569 (Exch. 1668) (deciding that a judge's "favour shall not be presumed" merely because his brother-in-law was involved).
The early American conception of judicial disqualification was in keeping with the "clear and simple" common-law rule-"a judge was disqualified for direct pecuniary interest and for nothing else." Frank, Disqualification of Judges, 56 Yale L.J. 605, 609 (1947)(Frank); see also R.
*1918 Flamm, Judicial Disqualification: Recusal and Disqualification of Judges § 1.4, p. 7 (2d ed. 2007). Most jurisdictions required judges to recuse when they stood to profit from their involvement or, more broadly, when their property was involved. See Moses v. Julian, 45 N.H. 52, 55-56 (1863); see also, e.g., Jim v. State, 3 Mo. 147, 155 (1832)(deciding that a judge was unlawfully interested in a criminal case in which his slave was the defendant). But the judge's pecuniary interest had to be directly implicated in the case. See, e.g., Davis v. State, 44 Tex. 523, 524 (1876)(deciding that a judge, who was the victim of a theft, was not disqualified in the prosecution of the theft); see also T. Cooley, Constitutional Limitations 594 (7th ed. 1903) (rejecting a financial stake "so remote, trifling, and insignificant that it may fairly be supposed to be incapable of affecting the judgment"); Moses, supra, at 57 ("[A] creditor, lessee, or debtor, may be judge in the case of his debtor, landlord, or creditor, except in cases where the amount of the party's property involved in the suit is so great that his ability to meet his engagements with the judge may depend upon the success of his suit"); Inhabitants of Readington Twp. Hunterdon County v. Dilley, 24 N.J.L. 209, 212-213 (N.J.1853)(deciding that a judge, who had previously been paid to survey the roadway at issue in the case, was not disqualified).
Shortly after the founding, American notions of judicial disqualification expanded in important respects. Of particular relevance here, the National and State Legislatures enacted statutes and constitutional provisions that diverged from the common law by requiring disqualification when the judge had served as counsel for one of the parties. The first federal recusal statute, for example, required disqualification not only when the judge was "concerned in interest," but also when he "ha[d] been of counsel for either party." Act of May 8, 1792, § 11, 1 Stat. 278-279. Many States followed suit by enacting similar disqualification statutes or constitutional provisions expanding the common-law rule. See, e.g., Wilks v. State, 27 Tex.App. 381, 385, 11 S.W. 415, 416 (1889);Fechheimer v. Washington, 77 Ind. 366, 368 (1881)(per curiam );Sjorberg v. Nordin, 26 Minn. 501, 503, 5 N.W. 677, 678 (1880);Whipple v. Saginaw Circuit Court Judge, 26 Mich. 342, 343 (1873); Mathis v. State, 50 Tenn. 127, 128 (1871); but see Owings v. Gibson, 9 Ky. 515, 517-518 (1820)(deciding that it was for the judge to choose whether he could fairly adjudicate a case in which he had served as a lawyer for the plaintiff in the same action). Courts applied this expanded view of disqualification not only in cases involving judges who had previously served as counsel for private parties but also for those who previously served as former attorneys general or district attorneys. See, e.g., Terry v. State, 24 S.W. 510, 510-511 (Tex.Crim.App.1893); Mathis, supra, at 128.
This expansion was modest: disqualification was required only when the newly appointed judge had served as counsel in the same case . In Carr v. Fife, 156 U.S. 494, 15 S.Ct. 427, 39 L.Ed. 508 (1895), for example, this Court rejected the argument that a judge was required to recuse because he had previously served as counsel for some of the defendants in another matter. Id., at 497-498, 15 S.Ct. 427. The Court left it to the judge "to decide for himself whether it was improper for him to sit in trial of the suit." Id ., at 498, 15 S.Ct. 427. Likewise, in Taylor v. Williams, 26 Tex. 583 (1863), the Supreme Court of Texas acknowledged that a judge was not, "by the common law, disqualified from sitting in a cause in which he had been of counsel" and concluded "that the fact that the presiding judge had been of counsel in the case did not necessarily render him *1919 interested in it." Id., at 585-586. A fortiori, the Texas court held, a judge was not "interested" in a case "merely from his having been of counsel in another cause involving the same title." Id., at 586(emphasis added); see also The Richmond, 9 F. 863, 864 (C.C.E.D.La.1881)("The decisions, so far as I have been able to find, are unanimous that 'of counsel' means 'of counsel for a party in that cause and in that controversy,' and if either the cause or controversy is not identical the disqualification does not exist"); Wolfe v. Hines, 93 Ga. 329, 20 S.E. 322 (1894)(same); Cleghorn v. Cleghorn, 66 Cal. 309, 5 P. 516 (1885)(same).
This limitation-that the same person must act as counsel and adjudicator in the same case -makes good sense. At least one of the State's highest courts feared that any broader rule would wreak havoc: "If the circumstance of the judge having been of counsel, for some parties in some case involving some of the issues which had been theretofore tried[,] disqualified him from acting in every case in which any of those parties, or those issues should be subsequently involved, the most eminent members of the bar, would, by reason of their extensive professional relations and their large experience be rendered ineligible, or useless as judges." Blackburn v. Craufurd, 22 Md. 447, 459 (1864). Indeed, any broader rule would be at odds with this Court's historical practice. Past Justices have decided cases involving their former clients in the private sector or their former offices in the public sector. See Frank 622-625. The examples are legion; chief among them is Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803), in which then-Secretary of State John Marshall sealed but failed to deliver William Marbury's commission and then, as newly appointed Chief Justice, Marshall decided whether mandamus was an available remedy to require James Madison to finish the job. See Paulsen, Marbury's Wrongness, 20 Constitutional Commentary 343, 350 (2003).
Over the next century, this Court entered the fray of judicial disqualifications only a handful of times. Drawing from longstanding historical practice, the Court announced that the Due Process Clause compels judges to disqualify in the narrow circumstances described below. But time and again, the Court cautioned that "[a]ll questions of judicial qualification may not involve constitutional validity." Tumey, 273 U.S., at 523, 47 S.Ct. 437. And "matters of kinship, personal bias, state policy, remoteness of interest would seem generally to be matters merely of legislative discretion." Ibid. ; see also Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 828, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986)("The Due Process Clause demarks only the outer boundaries of judicial disqualifications").
First, in Tumey, the Court held that due process would not tolerate an adjudicator who would profit from the case if he convicted the defendant. The Court's holding paralleled the common-law rule: "[I]t certainly violates the Fourteenth Amendment, and deprives a defendant in a criminal case of due process of law, to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." 273 U.S., at 523, 47 S.Ct. 437(emphasis added); see also Ward v. Monroeville, 409 U.S. 57, 59, 61, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972)(deciding that a mayor could not adjudicate traffic violations if revenue from convictions constituted a substantial portion of the municipality's revenue). Later, applying Tumey 's rule in Aetna Life Ins., the Court held that a judge who decided a case involving an insurance company had a "direct, personal, substantial, and pecuniary" interest because he had brought a *1920 similar case against an insurer and his opinion for the court "had the clear and immediate effect of enhancing both the legal status and the settlement value of his own case." 475 U.S., at 824, 106 S.Ct. 1580(alterations and internal quotation marks omitted).
Second, in In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), the Court adopted a constitutional rule resembling the historical practice for disqualification of former counsel. Id., at 139, 75 S.Ct. 623. There, state law empowered a trial judge to sit as a " 'one man judge-grand jury,' " meaning that he could "compel witnesses to appear before him in secret to testify about suspected crimes." Id., at 133, 75 S.Ct. 623. During those secret proceedings, the trial judge suspected that one of the witnesses, Lee Roy Murchison, had committed perjury, and he charged another, John White, with contempt after he refused to answer the judge's questions without counsel present. See id., at 134-135, 75 S.Ct. 623. The judge then tried both men in open court and convicted and sentenced them based, in part, on his interrogation of them in the secret proceedings. See id., at 135, 138-139, 75 S.Ct. 623. The defendants appealed, arguing that the "trial before the judge who was at the same time the complainant, indicter and prosecutor, constituted a denial of fair and impartial trial required by" due process. Id., at 135, 75 S.Ct. 623. This Court agreed: "It would be very strange if our system of law permitted a judge to act as a grand jury and then try the very persons accused as a result of his investigations." Id., at 137, 75 S.Ct. 623. Broadly speaking, Murchison 's rule constitutionalizes the early American statutes requiring disqualification when a single person acts as both counsel and judge in a single civil or criminal proceeding.[3]
Both Tumey and Murchison arguably reflect historical understandings of judicial disqualification. Traditionally, judges disqualified themselves when they had a direct and substantial pecuniary interest or when they served as counsel in the same case.
B
Those same historical understandings of judicial disqualification resolve Williams' case. Castille did not serve as both prosecutor and judge in the case before us. Even assuming Castille's supervisory role as district attorney was tantamount to serving as "counsel" in Williams' criminal case, that case ended nearly five years before Castille joined the Supreme Court of Pennsylvania. Castille then participated in a separate proceeding by reviewing Williams' petition for postconviction relief.
As discussed above, see Part I-B, supra, this postconviction proceeding is not an extension of Williams' criminal case but is instead a new civil proceeding. See Finley, 481 U.S., at 556-557, 107 S.Ct. 1990. Our case law bears out the many distinctions between the two proceedings. In his criminal case, Williams was presumed innocent, Coffin v. United States, 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895), and the Constitution guaranteed him counsel, Gideon v. Wainwright, 372 U.S. 335, 344-345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Powell v. Alabama, 287 U.S. 45, 68-69, 53 S.Ct. 55, 77 L.Ed. 158 (1932), a public trial by a jury of his peers, Duncan *1921 v. Louisiana, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and empowered him to confront the witnesses against him, Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), as well as all the other requirements of a criminal proceeding. But in postconviction proceedings, "the presumption of innocence [has] disappear[ed]." Herrera v. Collins, 506 U.S. 390, 399, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). The postconviction petitioner has no constitutional right to counsel. Finley, supra, at 555-557, 107 S.Ct. 1990; see also Johnson v. Avery, 393 U.S. 483, 488, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). Nor has this Court ever held that he has a right to demand that his postconviction court consider a freestanding claim of actual innocence, Herrera, supra, at 417-419, 113 S.Ct. 853or to demand the State to turn over exculpatory evidence, Osborne, 557 U.S., at 68-70, 129 S.Ct. 2308; see also Wright v. West, 505 U.S. 277, 293, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992)(plurality opinion) (cataloguing differences between direct and collateral review and concluding that "[t]hese differences simply reflect the fact that habeas review entails significant costs" (internal quotation marks omitted)). And, under the Court's precedents, his due process rights are "not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." Osborne, supra, at 69, 129 S.Ct. 2308.
Because Castille did not act as both counsel and judge in the same case, Castille's participation in the postconviction proceedings did not violate the Due Process Clause. Castille might have been "personal[ly] involve[d] in a critical trial decision," ante, at 1907, but that "trial" was Williams' criminal trial, not the postconviction proceedings before us now. Perhaps Castille's participation in Williams' postconviction proceeding was unwise, but it was within the bounds of historical practice. That should end this case, for it "is not for Members of this Court to decide from time to time whether a process approved by the legal traditions of our people is 'due' process." Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 28, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)(Scalia, J., concurring in judgment).
C
Today's holding departs both from common-law practice and this Court's prior precedents by ignoring the critical distinction between criminal and postconviction proceedings. Chief Justice Castille had no "direct, personal, substantial pecuniary interest" in the adjudication of Williams' fourth postconviction petition. Tumey, 273 U.S., at 523, 47 S.Ct. 437. And although the majority invokes Murchison, ante, at 1905 - 1907, it wrongly relies on that decision too. In Murchison, the judge acted as both the accuser and judge in the same proceeding. 349 U.S., at 137-139, 75 S.Ct. 623. But here, Castille did not. See Part II-B, supra .
The perceived bias that the majority fears is instead outside the bounds of the historical expectations of judicial recusal. Perceived bias (without more) was not recognized as a constitutionally compelled ground for disqualification until the Court's recent decision in Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009). In Caperton, the Court decided that due process demanded disqualification when "extreme facts" proved "the probability of actual bias." Id., at 886-887, 129 S.Ct. 2252. Caperton, of course, elicited more questions than answers. Id., at 893-898, 129 S.Ct. 2252(ROBERTS, C.J., dissenting). And its conclusion that bias alone could be grounds for disqualification as a constitutional *1922 matter "represents a complete departure from common law principles." Frank 618-619; see Blackstone 361 ("[T]he law will not suppose a possibility of bias or favor in a judge").
The Court, therefore, should not so readily extend Caperton 's "probability of actual bias" rule to state postconviction proceedings. This Court's precedents demand far less "process" in postconviction proceedings than in a criminal prosecution. See Osborne, supra, at 69, 129 S.Ct. 2308; see also Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)(concluding that the Due Process Clause does not demand "inflexible procedures universally applicable to every imaginable situation"). If a state habeas petitioner is not entitled to counsel as a constitutional matter in state postconviction proceedings, Finley, supra, at 555-557, 107 S.Ct. 1990it is not unreasonable to think that he is likewise not entitled to demand, as a constitutional matter, that a state postconviction court consider his case anew because a judge, who had no direct and substantial pecuniary interest and had not served as counsel in this case, failed to recuse himself.
The bias that the majority fears is a problem for the state legislature to resolve, not the Federal Constitution. See, e.g., Aetna Life Ins., 475 U.S., at 821, 106 S.Ct. 1580("We need not decide whether allegations of bias or prejudice by a judge of the type we have here would ever be sufficient under the Due Process Clause to force recusal"). And, indeed, it appears that Pennsylvania has set its own standard by requiring a judge to disqualify if he "served in governmental employment, and in such capacity participated personally and substantially as a lawyer or public official concerning the proceeding" in its Code of Judicial Conduct. See Pa.Code of Judicial Conduct Rule 2.11(A)(6)(b) (West 2016). Officials in Pennsylvania are fully capable of deciding when their judges have "participated personally and substantially" in a manner that would require disqualification without this Court's intervention. Due process requires no more, especially in state postconviction review where the States "ha[ve] more flexibility in deciding what procedures are needed." Osborne, supra, at 69, 129 S.Ct. 2308.
III
Even if I were to assume that an error occurred in Williams' state postconviction proceedings, the question remains whether there is anything left for the Pennsylvania courts to remedy. There is not.
The majority remands the case to "[a]llo[w] an appellate panel to reconsider a case without the participation of the interested member," which it declares "will permit judges to probe lines of analysis or engage in discussions they may have felt constrained to avoid in their first deliberations." Ante, at 1910. The majority neglects to mention that the Supreme Court of Pennsylvania might have done just that. It entertained Williams' motion for reargument without Castille, who had retired months before the court denied the motion. The Supreme Court of Pennsylvania is free to decide on remand that it cured any alleged deprivation of due process in Williams' postconviction proceeding by considering his motion for reargument without Castille's participation.
* * *
This is not a case about the " 'accused.' " Ante, at 1910 (quoting Tumey, supra, at 532, 47 S.Ct. 437). It is a case about the due process rights of the already convicted. Whatever those rights might be, they do not include policing alleged violations of state codes of judicial ethics in postconviction proceedings. The Due Process Clause does not require any and all conceivable *1923 procedural protections that Members of this Court think "Western liberal democratic government ought to guarantee to its citizens." Monaghan, Our Perfect Constitution, 56 N.Y.U.L. Rev. 353, 358 (1981) (emphasis deleted). I respectfully dissent.

In 2005, Williams also filed a federal habeas petition, which the federal courts ultimately rejected. Williams v. Beard, 637 F.3d 195, 238 (C.A.3 2011)(Williams V ), cert. denied, Williams v. Wetzel, 567 U.S. ----, 133 S.Ct. 65, 183 L.Ed.2d 711 (2012).

Setting aside how a prosecutor could violate Brady by failing to disclose information to the defendant about the defendant's motive to kill, it is worth noting that this allegation merely repackaged old arguments. During a state postconviction hearing in 1998, Williams had presented evidence of his prior sexual abuse, including "multiple sexual victimizations (including sodomy) during his childhood," to support his ineffective assistance claim. Williams II, 581 Pa. 57, 98, 863 A.2d 505, 530 (2004)(Saylor, J., dissenting). And he had "argued [that the victim] engaged in homosexual acts with him." Williams VI, --- Pa., at ----, 105 A.3d, at 1236. Then, in his federal habeas proceedings, Williams admitted that his plan on the night of the murder was to threaten to reveal to the victim's wife that the victim was a homosexual, and he contended that his attorney should have presented related evidence of the victim's prior sexual relationship with him. Williams V, supra, at 200, 225-226, 229-230.

The Court has applied Murchison in later cases involving contempt proceedings in which a litigant's contemptuous conduct is so egregious that the judge "become[s] so 'personally embroiled' " in the controversy that it is as if the judge is a party himself. Mayberry v. Pennsylvania, 400 U.S. 455, 465, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); see also Taylor v. Hayes, 418 U.S. 488, 501-503, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974).