**[J-52-2015]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 14 EM 2015 |
| | : | |
| Petitioner | : | Emergency Petition for Extraordinary |
| | : | Relief Under King's Bench Jurisdiction |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| TERRANCE WILLIAMS, | : | |
| | : | |
| Respondent | : | ARGUED: September 10, 2015 |

**OPINION**

**MR. JUSTICE BAER**                    **DECIDED: December 21, 2015**

This case presents the issue of whether Governor Tom Wolf exceeded his constitutional authority pursuant to Article IV, Section 9(a) of the Pennsylvania Constitution when he issued a temporary reprieve to death row inmate Terrance Williams pending receipt of the forthcoming report of the Pennsylvania Task Force and Advisory Committee on Capital Punishment (Task Force) and until the concerns raised by the Task Force are addressed. We also examine the jurisdictional basis for review of such inquiry. For the reasons set forth herein, we exercise our King's Bench authority to review the issue presented and we conclude that Governor Wolf acted within his constitutional authority in granting the reprieve.

The record establishes that Respondent Terrance Williams was convicted of first degree murder after he robbed and beat Amos Norwood to death with a tire iron in 1984. He was subsequently sentenced to death. The details relating to Williams'

conviction are set forth in this Court's opinion affirming his death sentence on direct appeal. See Commonwealth v. Williams, 570 A.2d 75 (Pa. 1990). In the years that followed, Williams filed several petitions for collateral relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. After reviewing each of his first three PCRA petitions, the trial court denied relief and this Court affirmed. See Commonwealth v. Williams, 863 A.2d 505 (Pa. 2004); Commonwealth v. Williams, 909 A.2d 297 (Pa. 2006) (*per curiam*); Commonwealth v. Williams, 962 A.2d 609 (Pa. 2009) (*per curiam*). During the pendency of his third PCRA petition, Williams also filed a federal *habeas corpus* petition. The federal district court denied relief, and the Third Circuit Court of Appeals affirmed that decision. Williams v. Beard, 637 F.3d 195, 238 (3d Cir. 2011).

In 2012, Williams filed his fourth PCRA petition, following which the trial court granted a stay of execution, vacated his death sentence, and awarded him a new penalty hearing. On December 15, 2014, we vacated the stay of execution and the grant of a new penalty phase, and reinstated Williams' sentence of death, concluding that he had not satisfied the "governmental interference" exception to the timeliness requirement of the PCRA set forth at 42 Pa.C.S. § 9545(b)(1)(i). Commonwealth v. Williams, 105 A.3d 1234 (Pa. 2014), *cert. granted on other grounds*, Williams v. Pennsylvania, 136 S.Ct. 28 (2015).[1] During the pendency of his fourth PCRA petition, Williams sought a recommendation of pardon or commutation from the Board of Pardons, which request was denied.

---

[1] On October 1, 2015, the United States Supreme Court granted *certiorari* to examine whether former Chief Justice Castille should have recused himself from the case based on his alleged prior participation in Williams' prosecution while serving as the District Attorney of Philadelphia. At this juncture, it is wholly speculative to surmise that the final resolution of Williams' case in the High Court would have any impact on the issue presented herein.

On January 13, 2015, Governor Tom Corbett signed a death warrant scheduling Williams' execution for March 4, 2015. Shortly after the death warrant was signed, Governor Tom Wolf assumed office and, on February 13, 2015, issued a reprieve of Williams' death sentence. The operative language of the reprieve stated:

> NOW THEREFORE, I, Tom Wolf, as Governor of the Commonwealth of Pennsylvania, by virtue of the authority invested in me under the Constitution and Laws of the Commonwealth, do hereby grant a temporary reprieve of the execution unto Terrance Williams until I have received and reviewed the forthcoming report of the Pennsylvania Task Force and Advisory Committee on Capital Punishment, and any recommendations contained therein are satisfactorily addressed.

On the same day, Governor Wolf issued a Memorandum, explaining that he granted Williams' reprieve because he believed that "the capital punishment system has significant and widely recognized defects." Governor Wolf's Memorandum dated February 13, 2015, at 1. He indicated that he would "grant a reprieve in each future instance in which an execution is scheduled" until he received and reviewed a report to be drafted by the Task Force, which was established by Senate Resolution 6 of 2011, and until any concerns raised by the Task Force were addressed satisfactorily.[2] Id. In a press release also issued on February 13, 2015, Governor Wolf described his grant of

---

[2] Senate Resolution No. 6 of 2011 directed the Joint State Government Commission to establish a bipartisan task force and an advisory committee to conduct a study of capital punishment in this Commonwealth and to report their findings and recommendations. The resolution acknowledged, *inter alia*, that since 1978, 352 people have been sentenced to death in Pennsylvania and only three individuals have been executed. It also identified concerns about Pennsylvania's death penalty system, which were raised by the American Bar Association and the Pennsylvania Supreme Court Committee on Racial and Gender Bias in the Justice System. The resolution enumerated seventeen specific subjects that the Task Force was directed to study, including the costs associated with the death penalty and the quality of counsel provided to indigent capital defendants. The Task Force is co-chaired by Senators Stewart Greenleaf and Daylin Leach.

Williams' reprieve as being the first step in placing a moratorium on the death penalty in Pennsylvania.[3]

Five days later, on February 18, 2015, the District Attorney of Philadelphia (Commonwealth) filed an Emergency Petition for Extraordinary Relief Under King's Bench Jurisdiction, naming Respondent Williams as the opposing party. Therein, the Commonwealth requested that we invoke either our King's Bench authority or our extraordinary jurisdiction pursuant to 42 Pa.C.S. § 726 to determine whether Governor Wolf's grant of Williams' reprieve violated Article IV, Section 9 of the Pennsylvania Constitution.[4] [5] It asserted that King's Bench review was warranted because Governor

_____

[3] The term "moratorium" is neither defined nor referenced in the Pennsylvania Constitution, but is commonly understood as being a "suspension or delay of any action or activity." AMERICAN HERITAGE DICTIONARY 551 (4th ed. 2001). As explained infra, Governor Wolf's characterization of Williams' reprieve as being the first step in placing a moratorium on the death penalty is relevant to the extent that it relates to the constitutionality of the reprieve granted to Williams, which was expressly conditioned upon review of the Task Force's recommendations and satisfaction of any concerns raised therein. However, the propriety of statements made by Governor Wolf in his press release and future actions taken by him in other death penalty cases are not currently before this Court.

Additionally, the parties acknowledge that Pennsylvania Governors have twice declared an unchallenged moratorium on the death penalty. In 1961, Governor David L. Lawrence announced a moratorium on executions until the General Assembly considered a bill to repeal the death penalty, which was ultimately defeated. See Respondent's Appendix at 214-215 (setting forth newspaper articles reporting the Governor's moratorium on the death penalty). In 1971, when the case of Furman v. Georgia, 408 U.S. 238 (1972), was pending in the United States Supreme Court, Governor-elect Milton J. Shapp declared that he would not permit executions during his tenure as the Commonwealth's chief executive. Id. at 218-221.

[4] In its brief to this Court, the Commonwealth appears to abandon its request for exercise of extraordinary jurisdiction pursuant to 42 Pa.C.S. § 726, and seeks invocation of only King's Bench jurisdiction. As noted, infra, we discuss extraordinary jurisdiction as Governor Wolf contends it is an available avenue for review.

[5] Article IV, Section 9 states in its entirety:

(continued…)

Wolf was attempting to negate a criminal penalty applicable to an entire class of cases, *i.e.*, first degree murder cases where the death penalty was imposed, based on his personal belief that Pennsylvania's death penalty apparatus is flawed.

The Commonwealth argued that the Pennsylvania Constitution did not permit the Governor to grant the purported reprieve for purposes of establishing a moratorium on the death penalty. It submitted that the reprieve lacked a determinable end date as it was uncertain when the Task Force report would be issued, what its concerns would be, and when the Governor's personal level of satisfaction would be met regarding palliative measures to address those concerns. The Commonwealth emphasized that the reprieve was not issued to allow Williams to pursue an available legal remedy as he had already exhausted his right to direct and collateral review and the Pardon Board had

---

(…continued)

> (a) In all criminal cases except impeachment the Governor shall have power to remit fines and forfeitures, to grant reprieves, commutation of sentences and pardons; but no pardon shall be granted, nor sentence commuted, except on the recommendation in writing of a majority of the Board of Pardons, and, in the case of a sentence of death or life imprisonment, on the unanimous recommendation in writing of the Board of Pardons, after full hearing in open session, upon due public notice. The recommendation, with the reasons therefor at length, shall be delivered to the Governor and a copy thereof shall be kept on file in the office of the Lieutenant Governor in a docket kept for that purpose.
>
> (b) The Board of Pardons shall consist of the Lieutenant Governor who shall be chairman, the Attorney General and three members appointed by the Governor with the consent of a majority of the members elected to the Senate for terms of six years. The three members appointed by the Governor shall be residents of Pennsylvania. One shall be a crime victim, one a corrections expert and the third a doctor of medicine, psychiatrist or psychologist. The board shall keep records of its actions, which shall at all times be open for public inspection.

PA. CONST. art. IV, § 9.

denied him a commutation and pardon. It concluded that Governor Wolf violated the doctrine of separation of powers by seeking to nullify valid, final judgments of sentence. Accordingly, the Commonwealth sought a declaration that the Governor's reprieve was a legal nullity.

Both the Governor and Williams filed responses to the Commonwealth's application.[6] The Governor requested that we deny the Commonwealth's petition on the ground that the reprieve was issued pursuant to his express constitutional authority in Article IV, Section (9)(a), which, he asserted, contains no restrictions on the duration or purpose of reprieves. Governor Wolf refuted the Commonwealth's suggestion of a separation of powers violation by contending that he was not encroaching upon the judiciary or legislative branch, but rather was exercising a constitutional reprieve power granted exclusively to the executive branch. Alternatively, Governor Wolf requested that the Court order full briefing and schedule oral argument to consider the issue in a more deliberative manner. Williams likewise opposed the Commonwealth's emergency petition on grounds similar to those raised by Governor Wolf. He further emphasized that the reprieve was valid as it was issued in Williams' specific case for the defined purpose of reviewing the Task Force's recommendation regarding the validity of the death penalty.

By order dated March 3, 2015, we granted further review of the Commonwealth's petition, denied the Commonwealth's request for expedited review, and ordered that the Governor be joined as a party. We directed our Prothonotary to establish a briefing schedule and to list the matter for oral argument on the issue of the propriety of this Court's exercise of King's Bench review, as well as the merits of the constitutional

---

[6] Although Governor Wolf was not named in the Commonwealth's action, this Court directed that he file a response to the emergency petition.

challenge to Governor Wolf's reprieve. Oral argument was conducted on September 10, 2015, and the matter is now ready for disposition.

## I. Jurisdiction

We must first determine the basis for our jurisdiction. The Commonwealth begins by positing that to avoid deleterious effects that may result from delays attendant to the ordinary process of law, this Court may exercise King's Bench authority to review issues of public importance that require timely intervention by the court of last resort. Brief of the Commonwealth at 21 (citing In re Bruno, 101 A.3d 635, 670 (Pa. 2014)). It requests that we invoke King's Bench power here to entertain the important question of whether Governor Wolf may issue a reprieve that is unlimited in time and is not based on Williams' individual circumstances, but rather is imposed to further the Governor's policy of declaring a moratorium on the death penalty.

As developed in the merits analysis, the Commonwealth asserts that the Governor's action in this regard intrudes upon judicial authority by effectively reversing final sanctions imposed in all capital cases in Pennsylvania, and raises fundamental constitutional questions regarding the scope of executive and judicial power, all of which will recur as the Governor's moratorium continues. It further alleges that time is of the essence because Governor Wolf should not be afforded the opportunity to delay execution when all avenues of review have been exhausted in Williams' case, including a petition for clemency rejected by the Board of Pardons. The Commonwealth also points out that this Court has invoked its King's Bench jurisdiction previously to review the constitutional validity of a Governor's exercise of power. See Creamer v. Twelve Common Pleas Judges, 281 A.2d 57, 58 (Pa. 1971) (per curiam) (exercising King's Bench authority to determine whether the Governor's appointments to the judiciary fell

within his constitutional authority under Article V, Section 13(b) of the Pennsylvania Constitution).[7]

Emphasizing the discretionary nature of King's Bench jurisdiction, Williams responds that the doctrine should not be invoked here because the Commonwealth has failed to establish a clear right to relief on the merits as Governor Wolf's issuance of the reprieve derived from explicit constitutional authority. While acknowledging that this Court has invoked King's Bench jurisdiction to address allegations that another branch of government has encroached upon its judicial power, Williams nevertheless advocates for a more narrow interpretation of the doctrine. He urges us to limit the exercise of our King's Bench authority to cases involving the supervision of lower tribunals and judges, and to decline to invoke the doctrine to review the propriety of a clemency action taken by the chief executive.

Governor Wolf reiterates this sentiment, advocating that we decline to exercise King's Bench authority, contending that this power encompasses only the superintendency of inferior judicial tribunals and officers, and not executive actions. Notably, however, the Governor does not oppose this Court's review of the instant controversy, and requests that we resolve this important legal issue pursuant to our

---

[7] The Pennsylvania District Attorneys Association (PDAA), which represents the Offices of the District Attorney for all 67 counties, has filed an *amicus* brief in support of the Commonwealth and joins the argument that King's Bench jurisdiction should be invoked here. It asserts that as a result of the Governor's declaration of a moratorium on the death penalty, capital defendants are requesting trial courts to strike aggravating circumstances set forth in notices of intent to seek the death penalty and to compel the Commonwealth to forego death penalty prosecutions. See e.g. Commonwealth v. Newell, No. 2642 of 2013 (Pa. Ct. Com. PL. Monroe Ctny. Mar. 12, 2015). The PDAA asserts that these defense tactics demonstrate that, absent a ruling in the Commonwealth's favor, the Governor's actions will have additional negative effects on the criminal justice system, including impacting plea discussions and negotiations.

extraordinary jurisdiction under Section 726 of the Judicial Code, which permits this Court to assume plenary jurisdiction in a matter of immediate public importance that is pending in a lower tribunal.[8]  Recognizing the absence of a pending case in a lower tribunal over which this Court could assume extraordinary jurisdiction, Governor Wolf posits that the instant case could have been brought (or could technically be transferred to) the Commonwealth Court in its original jurisdiction, after which we could invoke our extraordinary jurisdiction under Section 726.  Rather than engaging in such technical maneuvering, the Governor suggests that we decide the case before us by exercising extraordinary jurisdiction under Section 726.  See Brief of Governor Wolf at 4-5 (*citing* Pa. Gaming Control Board v. City Council of Philadelphia, 928 A.2d 1255, 1272 (Pa. 2007) (J. Baer, concurring) (opining that because this Court could transfer the particular matter to the proper lower tribunal and then invoke our extraordinary jurisdiction under Section 726, we should avoid technical maneuvering, and simply decide the case under Section 726)).

It is well-established that "[a]ll Pennsylvania courts derive power or authority, and the attendant jurisdiction over the subject matter, from the Constitution and the laws of the Commonwealth." In re Bruno, 101 A.3d at 659 (citing PA. CONST. art. V, § 2; 42 Pa.C.S. § 502).  Article V, Section 2 of the Pennsylvania Constitution provides, in

---

[8] Section 726, entitled "Extraordinary jurisdiction," states:

> Notwithstanding any other provision of law, the Supreme Court may, on its own motion or upon petition of any party, in any matter pending before any court or magisterial district judge of this Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done.

42 Pa.C.S. § 726.

relevant part, that the Supreme Court "shall be the highest court of the Commonwealth and in this court shall be reposed the supreme judicial power of the Commonwealth." PA. CONST. art. V, § 2(a). Section 2 further provides that the Supreme Court "shall have such jurisdiction as shall be provided by law." Id. at 2(c).

In addition to providing for this Court's original and appellate jurisdiction,[9] the General Assembly has recognized our King's Bench authority in Section 502 of the Judicial Code ("General powers of Supreme Court"), which states:

> The Supreme Court shall have and exercise the powers vested in it by the Constitution of Pennsylvania, including the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722. The Supreme Court shall also have and exercise the following powers:
>
> (1) All powers necessary or appropriate in aid of its original and appellate jurisdiction which are agreeable to the usages and principles of law.
> (2) The powers vested in it by statute, including the provisions of this title.

42 Pa.C.S. § 502.[10]

As recognized by the Commonwealth, King's Bench authority is generally invoked to review an issue of public importance that requires timely intervention by the court of last resort to avoid the deleterious effects arising from delays incident to the

---

[9] This Court's original jurisdiction is set forth in 42 Pa.C.S. § 721, which includes *habeas corpus*, mandamus or prohibition to courts of inferior jurisdiction, and *quo warranto* as to any officer of statewide jurisdiction. Our appellate jurisdiction is set forth in 42 Pa.C.S. §§ 722 through 725.

[10] The Pennsylvania Constitution confirms our authority in this regard as it provides that this Court retains all powers vested at the time of the 1968 amendments of Article V. See In re Bruno, 101 A.3d at 665 (citing PA. CONST. SCHED. art. V, § 1).

ordinary process of law. In re Bruno, 101 A.3d at 670. While such authority is exercised with extreme caution, the availability of the power is essential to a well-functioning judicial system. Id. The exercise of King's Bench authority is not limited by prescribed forms of procedure or to action upon writs of a particular nature; rather, the Court may employ any type of process necessary for the circumstances. In re Franciscus, 369 A.2d 1190, 1193 (Pa. 1977) (citing Petition of Squires & Constables Ass'n of Pa., 275 A.2d 657 (Pa. 1971)). We may even exercise King's Bench powers over a matter where no dispute is pending in a lower court. In re Assignment of Avellino, 690 A.2d 1138, 1140 (Pa. 1997). In exercising King's Bench authority, our "principal obligations are to conscientiously guard the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system, all for the protection of the citizens of this Commonwealth." In re Bruno at 675; In re Franciscus, 369 A.2d at 1194.

Consistent with this jurisprudence, we conclude that it is proper to invoke King's Bench jurisdiction under the facts presented. Here, the Commonwealth has sought invocation of King's Bench authority based on the allegation that, under the guise of an exercise of the executive reprieve power, Governor Wolf has encroached upon this Court's final judgment in Williams' case and has attempted to negate unilaterally the proscribed sanction in all cases where this Court has affirmed the death penalty. Regardless of whether we agree with the Commonwealth on the ultimate merits of its contention, neither the Governor nor Williams has offered a persuasive reason why our broad King's Bench authority would not embrace such a forceful challenge to the integrity of the judicial process. Appreciating that King's Bench authority should be exercised with extreme caution, we conclude that the Commonwealth has established

that the issue presented is one of significant public importance that requires timely intervention by this Court.

We respectfully reject the proposition that this case is insulated from King's Bench review because it involves a constitutional challenge to the exercise of the executive reprieve power, rather than a challenge to an action taken by a lower tribunal or judge. This Court has never adopted such a narrow view of the King's Bench authority and we decline the invitation of the Governor and Williams to do so in the instant case. See Creamer v. Twelve Common Pleas Judges, 281 A.2d 57, 58 (Pa. 1971) (*per curiam*) (assuming King's Bench authority to determine whether the Governor's appointments to the judiciary fell within his constitutional authority under Article V, Section 13(b) of the Pennsylvania Constitution); see also Fagan v. Smith, 41 A.3d 816 (Pa. 2012) (*per curiam*) (assuming King's Bench jurisdiction over electors' petition for mandamus and ordering the Speaker of the Pennsylvania House of Representatives to issue writs of election for special elections to fill vacancies in enumerated legislative districts); Pa. Gaming Control Bd. v. City Council of Phila., 928 928 A.2d 1255, 1264 n.6 (Pa. 2007) (invoking King's Bench jurisdiction as an alternative ground to review a challenge to actions taken by the Philadelphia City Council and the Philadelphia Board of Elections that had profound importance and generated substantial public attention).

This Court recently cautioned:

> We would be remiss to interpret the Court's supervisory authority at King's Bench in narrow terms, contrary to precedent and the transcendent nature and purpose of the power. The Court long ago warned against any judicial inclination to narrow that authority, lest the members of the Court abandon their duty to exercise the power they hold in trust for the people.

In re Bruno, 101 A.3d at 679.

Heeding this warning, we have no hesitation in exercising our King's Bench jurisdiction to review the Commonwealth's allegation that this Court's power to impose a final sentence of death has been usurped by the Governor's unconstitutional issuance of a reprieve to Williams.[11]

## II. Constitutional Challenge to Williams' Reprieve

## A. The Parties' Arguments

As referenced above, the Commonwealth's primary argument is that the Governor's reprieve power pursuant to Article IV, Section 9 does not encompass the power to grant Williams a reprieve for an unlimited duration and absent a particular purpose relating to the individual circumstances of the case. Further, the Commonwealth maintains, the Governor has no authority to declare a moratorium on all capital sentences merely by labeling his order a "reprieve." The Commonwealth contends that the chief executive's actions in this regard violate Article IV, Section 9(a) because they amount to a unilateral and categorical commutation of death sentences, without the consent of the Board of Pardons. See PA. CONST. art. IV, § 9(a) (providing that "no pardon shall be granted, nor sentence commuted, except on the recommendation in writing of a majority of the Board of Pardons"). If the practical effect of commutation could be achieved via a reprieve, the Commonwealth asserts, requiring unanimous consent of the Board of Pardons would become an act of futility.

In support of its contention, the Commonwealth relies upon language in the Commonwealth Court's decision in Morganelli v. Casey, 646 A.2d 744 (Pa. Cmwlth. 1994), which describes a reprieve as being issued for a particular reason and for a

---

[11] Having concluded that we possess King's Bench jurisdiction over this matter, we need not examine whether we also possess extraordinary jurisdiction under Section 726 of the Judicial Code.

specific duration.  Id., 646 A.2d at 747 (providing that "[i]f any governor desires to relieve a defendant from the prospect of execution of sentence, that executive should do so, presumably for an expressed reason and for a defined time period").  It likewise relies on a particular description of "reprieve" appearing in Black's Law Dictionary, which provides that a reprieve "does no more than stay the execution of a sentence for a time, and is ordinarily an act of clemency extended to a prisoner to afford him an opportunity to procure some amelioration of the sentence imposed."  BLACK'S LAW DICTIONARY 1170 (5th ed. 1979).

According to the Commonwealth, this same understanding of a reprieve, as being issued for a limited purpose and duration, is logical in that the reason for issuing a reprieve defines its duration.  To illustrate, it asserts that when granting a reprieve to allow for a collateral proceeding under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-45, a governor would not need to set forth a precise end date as the reprieve would be temporally and functionally limited by the associated proceeding.  See Commonwealth v. Haag, 809 A.2d 271, 276 (Pa. 2002) (reprieve issued "pending resolution of Haag's PCRA proceedings").  Conversely, the Commonwealth contends, a purported reprieve that is effective "until decided otherwise," as alleged in the instant case, lacks the defining characteristics of a reprieve, and, thus, is not a reprieve at all. It is the Commonwealth's position that Governor Wolf may not deviate from the accepted definition of reprieve in Pennsylvania, as stated in Morganelli, and allow the stay to continue infinitely until he, alone, is personally satisfied that the concerns of the Task Force have been addressed.  Because Governor Wolf's satisfaction may never be obtained, the Commonwealth argues that the reprieve, for all intents and purposes, is permanent.

Moreover, the Commonwealth contends, the Governor is not in a position to remedy any concerns the Task Force may have with the existing death penalty statute. It asserts that even if the General Assembly were to enact subsequent remedial legislation, it would not alter Williams' final death sentence or that of any other death row inmate without violating the separation of powers doctrine. See Brief of Commonwealth at 37-40 (citing Commonwealth v. Sutley, 378 A.2d 780, 784 (Pa. 1977) (holding that "even though the legislature possesses the power to promulgate the substantive law, judicial judgments and decrees entered pursuant to those laws may not be affected by subsequent legislative changes after those judgments and decrees have become final")).

The Commonwealth further posits that Governor Wolf's attempt to create a moratorium on the death penalty violates Article IV, Section 2 of the Pennsylvania Constitution, which states that "[t]he supreme executive power shall be vested in the Governor, who shall take care that the laws be faithfully executed . . . ." PA. CONST. art. IV, § 2. Finally, it maintains, the Governor's actions unlawfully suspend death penalty laws enacted by the General Assembly in violation of Article I, Section 12, which provides that "[n]o power of suspending laws shall be exercised unless by the Legislature or by its authority." PA. CONST. art. I, §12.

In its *amicus* brief in support of the Commonwealth, the Pennsylvania District Attorneys Association (PDAA) joins the arguments that Governor Wolf exceeded his authority under Article IV, Section 9 when he issued Williams' reprieve and described it as the first step in imposing a moratorium on the death penalty. The PDAA offers a historical summary of the constitutional provision and asserts that while the Governor once enjoyed unfettered power to grant reprieves, commutations, and pardons, the

citizens of the Commonwealth limited the clemency power through constitutional amendments, especially in death cases.

For example, the PDAA asserts that by constitutional amendment in 1874, commutations and pardons were first made subject to the requirement of a recommendation by a group of officials that eventually became known as the Board of Pardons. In 1997, the PDAA submits, Article IV, Section 9 was again amended to require that a commutation or pardon in a case involving a sentence of life imprisonment or death must be subject to the unanimous recommendation of the Board of Pardons, a diversified body constituted by the Lieutenant Governor, the Attorney General, a crime victim, a corrections expert, and a doctor of either medicine, psychiatry or psychology. PA. CONST. art. IV, § 9(b). The PDAA gleans from this historical perspective that the citizens of this Commonwealth prefer a balanced view where the Board of Pardons determines when to recommend a pardon or commutation of sentence, instead of reserving such decision solely to a single chief executive elected through the political process.

According to the PDAA, this Court should look to the time of the adoption of the reprieve power in the Constitution of 1790, when the framers adhered to English common law, which defined a reprieve as the temporary withdrawal of a sentence for a specific interval in one of three scenarios: (1) where the convict requires time to apply for either an absolute or conditional pardon based on some defect in the particular case; (2) where a female convict is pregnant and in need of time to allow the child to be born before execution of the judgment; and (3) where the convict becomes temporarily insane between the judgment and execution. See Brief of PDAA at 23-25 (citing 2 William Blackstone, *Commentaries on the Laws of England* 312 (1848)). In each instance, the PDAA asserts, the reprieve was available for only a finite interval and for a

definitive reason specific to the convicted prisoner. It concludes that the term "reprieve" must, therefore, be defined in accordance with these limitations.

Here, the PDAA asserts, there is no finite end to the Governor's reprieve of Williams' sentence as it remains unclear what recommendations the Task Force will make and whether the Governor possesses the authority to implement the recommendations absent further legislation or judicial reform. According to the PDAA, the Task Force recommendations would only be the starting point for prolonged political and legislative debate, adding years to the duration of the reprieve, which the Governor proposes will continue until the Task Force recommendations are satisfactorily addressed. For these reasons, the PDAA requests a declaration that the Governor's alleged suspension of the death penalty by use of the reprieve power is unconstitutional and that the reprieve issued to Williams is void.[12] [13]

---

[12] The PDAA additionally contends that the Governor's interpretation of Article IV, Section 9 is contrary to the legislative procedure prescribing the Governor's course of action whenever a death warrant is to be issued, which necessarily contemplates that all reprieves will terminate on a specific and contemplated date. Amicus Brief of PDAA at 26 (citing 61 Pa.C.S. § 4302(a)(2) (providing that "[i]f, because of a reprieve or judicial stay of the execution, the date of execution passes without imposition of the death penalty, unless a pardon or commutation has been issued, the Governor shall, within 30 days after receiving notice of the termination of the reprieve or the judicial stay, reissue a warrant specifying a day for execution which shall be no later than 60 days after the date of reissuance of the warrant.")).

[13] The Speaker of the Pennsylvania House of Representatives and the President Pro Tempore of the Senate of Pennsylvania have also filed an *amicus* brief in support of the Commonwealth. Relying on comments made during the 1872-73 constitutional debates, the *amici* contend that the reprieve power was intended as a failsafe for the last minute arrival of information based on the facts in a particular case that arose so late in the process that a Board of Pardons could not be convened. They maintain that the reprieve power was not intended as an unrestricted allowance for a Governor to impose his will for an indeterminate period.

In support of the constitutional validity of the reprieve at issue, Williams responds that, except in cases of impeachment, the Pennsylvania Constitution of 1790 placed no limits on the reprieve power, which was entrusted exclusively to the Governor. Viewing the constitutional history of Article IV, Section 9, Williams highlights that after each constitutional amendment, the plain language of the reprieve clause remained the same, *i.e.*, affording virtual unfettered authority solely in the Governor's hands. See PA. CONST. art IV, § 9(a) (providing, "[i]n all criminal cases except for impeachment, the Governor shall have power to . . . grant reprieves). He contrasts this with a Governor's authority to pardon or commute a sentence, which has since been limited by constitutional amendment. For centuries, he submits, Pennsylvania Governors have granted reprieves for either definite or indefinite durations, and for political, personal, or religious reasons, or no express reason at all. Comparing the Pennsylvania reprieve power with that set forth in other state constitutions and the United States Constitution, Williams contends that the Pennsylvania Constitution provides the most robust and unencumbered executive power. He maintains that no court in the nation's history has invalidated an executive reprieve, and the Commonwealth's arguments clearly do not justify the adoption of a radical new course on the basis of the Pennsylvania constitutional reprieve power.

Examining the clear terms of the reprieve issued by Governor Wolf, Williams emphasizes that it is identified expressly as a "temporary reprieve" and that its legal effect is to continue the vitality of this Court's affirmance of his judgment of sentence of death. The express reprieve language acknowledges that Williams has been convicted of first degree murder and sentenced to death, and that his sentence has been affirmed on direct appeal. Because Williams remains on death row under sentence of death, he contends there is no merit to the Commonwealth's contention that the Governor's

actions amount to a pardon or commutation of sentence without the unanimous consent of the Board of Pardons. He suggests that the reprieve does nothing more than postpone his execution and is, thus, a valid exercise of power under the plain language of Article IV, Section 9. Even assuming a reprieve must be limited in duration and purpose, Williams contends that Governor Wolf's reprieve satisfies these requisites as it postpones his execution temporarily until the Task Force report is complete and any recommendations are addressed.

While acknowledging its lack of precedential value, Williams finds persuasive the Oregon Supreme Court's decision in Haugen v. Kitzhaber, 306 P.3d 592 (Ore. 2013), which rejected the argument that a reprieve violated Article V, Section 14 of the Oregon Constitution if it did not have a definitive termination date or a specified purpose relating to the particular facts of the case.[14] In Haugen, as part of a moratorium on executions, Oregon Governor John Kitzhaber granted a convicted prisoner a temporary reprieve "for the duration of [his] service as Governor." Id. at 595. After reviewing the language of the Oregon Constitution and the history of reprieves in England and America, the Haugen court upheld the validity of the reprieve and unanimously concluded there was no requirement of a specific termination date or an express purpose relating to the prisoner's individual circumstances. The court noted that, historically, governors and presidents have granted reprieves for a wide range of reasons, including political, personal or private reasons, and that nothing suggested that a reprieve had to be granted for one particular reason.

---

[14] Article V, Section 14 of the Oregon Constitution provides that the Governor "shall have power to grant reprieves, commutations and pardons, after conviction, for all offences except treason, subject to such regulations as may be provided by law." ORE. CONST. art. V, § 14.

Williams also rejects the Commonwealth's reliance upon Morganelli, contending that the decision did not place limits upon the executive reprieve power, but rather held that a governor's refusal to sign a death warrant did not constitute a reprieve. He argues that the crux of the Morganelli decision was simply that a governor could not grant a reprieve before the death warrant was issued because, at that point in time, there was no scheduled execution to stay. Here, unlike Morganelli, a death warrant was issued to Williams and Governor Wolf took the subsequent action of issuing a formal reprieve. For this reason, Williams asserts, any discussion in Morganelli describing a reprieve as limited in time and purpose constitutes *dicta*. Further, he posits, the Court's language in this regard was merely referencing a 1979 edition of Black's Law dictionary which described a reprieve as "ordinarily an act of clemency extended to a prisoner to afford him an opportunity to procure some amelioration of the sentence imposed." BLACK'S LAW DICTIONARY 1170 (5th ed. 1979). Williams concludes there was no definitive holding in Morganelli that a reprieve must include express limitations in purpose and duration for it to be constitutionally valid under Article IV, Section 9.

Finally, Williams contends, a reprieve does not become unconstitutional merely because a gubernatorial press release characterized it to be the first step in establishing a temporary moratorium on the death penalty. He asserts that, as discussed above, the Constitution's plain language and its historical application would not support such limitation. According to Williams, it would make little sense to limit the duration or purpose of reprieves when the Governor may grant an infinite number of them seriatim.

In his separate brief, Governor Wolf reiterates that Article IV, § 9(a) grants to the chief executive the exclusive power to issue reprieves in all criminal cases, except impeachment. As did Williams, he emphasizes that in contrast to the greater clemency powers of pardon and commutation, which must be exercised with the unanimous

consent of the Board of Pardons, the Governor's power to grant reprieves in non-impeachment cases is unlimited. Governor Wolf asserts that this broad and unfettered executive power has been reflected in both constitutional text and historical practice since the Commonwealth's earliest days. Thus, the Governor agrees with Williams that because the chief executive may define the reason for and duration of a reprieve as he sees fit, the challenged reprieve at issue is constitutional and should be upheld by this Court.

In this regard, he points out that the term "reprieve" is undefined in the constitution and the facially broad and unrestricted reprieve power is consistent with the King's power to reprieve as it existed under English Common Law and throughout Pennsylvania's constitutional history. He contends that this rich history belies the Commonwealth's contention that a reprieve is only valid if limited in duration and purpose, such as to stay a death warrant pending a clemency proceeding or a resumption of collateral review by a lower court.

According to the Governor, there are three categories of reprieves under English Common Law: (1) those granted by the Majesty himself, known as *es mandato regis*, meaning "of the King's mandate" or "from the mere pleasure of the crown;" (2) those granted by the judiciary upon the discretion of the judge before whom the prisoner was tried based on circumstances of the individual case, known as *ex arbitrio judicis*, meaning "at, in or upon the discretion of the judge;" and (3) those granted by the judiciary by operation of law where the convict was pregnant or insane, which rendered an immediate execution inconsistent with humanity or justice, known as *ex necessitate legis*, meaning "from or by necessity of law." See Brief of Governor Wolf at 17-18 (citing Chitty, Joseph, *A Treatise on the Law of the Prerogatives of the Crown; and the*

*Relative Duties and Rights of the Subject* 97 (1820); William Smithers & George Thorn, *Treatise on Executive Clemency in Pennsylvania* ("*Smithers & Thorn*") 78 (1909)).

The Governor asserts that the first category of reprieves is at issue here, *i.e.*, those granted "from the pleasure of the crown" (*es mandato regis).* He explains that these reprieves lie within the Governor's sole discretion and are unrelated to the judicially-granted reprieves or stays issued either by the discretion of the court due to circumstances unique to the individual case (*ex arbitrio judicis)* or by operation of law where the prisoner is pregnant or insane (*ex necessitate legis).* It is the Governor's contention that the Commonwealth and its *amicus* ignore this distinction between judicial and executive reprieves when they suggest that the reprieve power has been historically limited. To the contrary, the Governor contends, limits on reprieves arising from English common law applied only to the judicially-granted reprieves and had no application to the unfettered reprieve power of the Crown. See Brief for Governor Wolf at 20-21 (citing *Smithers and Thorn*, at 78 ("[i]n Provincial times both the court and the governor exercised the right [of reprieve,] but the latter seems to have been bound by no technical rules and reprieved indefinitely or on condition.")).

The Governor maintains that this historical review of English common law reveals the intended broad and discretionary nature of the executive reprieve power and contradicts any suggestion that the power is limited to a particular set of reasons or to a specific period of time. As the executive reprieve power is not otherwise limited by the Pennsylvania Constitution, he concludes that this Court has no reason to intervene to restrict the Governor's exercise of this purely executive power in this case, and requests that we enter judgment in his favor and against the Commonwealth.[15]

---

[15] An *amicus* brief has been filed in support of Williams and Governor Wolf by the following groups: the American Civil Liberties Union, the National Association for the Advancement of Colored People, the Philadelphia Bar Association, Pennsylvanians for (continued…)

In response to the arguments of Williams, Governor Wolf, and their *amici*, the Commonwealth asserts in its reply brief that relevant history provides no other popular understanding of the term "reprieve" other than one that postpones the execution of a sentence for a definite time and a particular purpose related to the circumstances of the convicted prisoner. It clarifies that it is not contending that the Commonwealth Court in Morganelli created the definition of reprieve as limited in time and purpose, but rather that its decision reiterated the commonly accepted definition of the term. The Commonwealth reiterates its position that the plain text of Article IV, Section 9 does not establish an unlimited executive reprieve power because an indefinite reprieve has the legal effect of a commutation of sentence, which cannot be granted absent unanimous consent by the Board of Pardons. Finally, the Commonwealth contends, history does not suggest that governors of constitutional republics, like Pennsylvania, inherited the powers of a medieval king. Instead, it argues, a reprieve was commonly understood as encompassing only a temporary respite.

---

(…continued)

Alternatives to the Death Penalty, and the Jewish Social Policy Action Network. These *amici* contend that Governor Wolf's reprieve should be upheld because Pennsylvania's capital punishment system fails to provide equal justice under the law. It asserts that the Task Force was created by the Senate because, *inter alia:* post-conviction DNA testing demonstrated wrongful convictions; the 2003 report of the Pennsylvania Supreme Court Committee on Racial and Gender Bias in the Justice System, which was based on a study commenced in 1999, has determined that racial, ethnic and gender biases exist and affect the way parties, litigants, witnesses and jurors are treated; and the American Bar Association has identified several areas in which Pennsylvania's death penalty system falters in guaranteeing each capital defendant fairness and accuracy in all proceedings. The *amici* allege that the primary problems that need to be solved in the capital arena include racial bias in jury selection and constitutionally deficient representation in capital cases, resulting from an underfunded system. These concerns can be remedied, *amici* contend, if we uphold Governor Wolf's reprieve and allow the Task Force to complete its report and have its concerns addressed.

## B. Analysis

Because we examine the issue of whether Williams' reprieve violates Article IV, Section 9(a) of the Pennsylvania Constitution pursuant to our King's Bench authority, our standard of review of this purely legal question is *de novo* and our scope of review is plenary. See Stilp v. Commonwealth, 905 A.2d 918, 930 (Pa. 2006) (providing for a plenary scope of review and *de novo* standard of review where we assumed plenary jurisdiction over a matter absent a lower court decision). In this case, as in all cases involving constitutional interpretation, we begin with a review of the text of the Constitution, which "must be interpreted in its popular sense, as understood by the people when they voted on its adoption." Jubelirer v. Rendell, 953 A.2d 514, 528 (Pa. 2008) (quoting Ieropoli v. AC&S Corp., 842 A.2d 919, 925 (Pa. 2004)). Along with examining the text of the constitutional provision to understand the intent of the voters who ratified it, we may consider, *inter alia*, the history and circumstances leading to the adoption of the provision, and case law from other states that have an identical or similar provision, which may be helpful and persuasive. Robinson Twp. v. Commonwealth, 83 A.3d 901, 944 (Pa. 2013).

As noted, the text of Article IV, Section 9(a) provides as follows:

> In all criminal cases except impeachment the Governor shall have power to remit fines and forfeitures, to grant reprieves, commutation of sentences and pardons; but no pardon shall be granted, nor sentence commuted, except on the recommendation in writing of a majority of the Board of Pardons, and, in the case of a sentence of death or life imprisonment, on the unanimous recommendation in writing of the Board of Pardons, after full hearing in open session, upon due public notice. The recommendation, with the reasons therefor at length, shall be delivered to the Governor and a copy thereof shall be kept on file in the office of the Lieutenant Governor in a docket kept for that purpose.

PA. CONST. art. IV, Section 9(a).

Reduced to its essence, the Commonwealth's position is that the Governor's reprieve power in Article IV, Section 9, which is unaccompanied by direct textual limitation other than an exception for impeachment cases, authorizes only reprieves of a fixed duration that are issued for a particular purpose attendant to the individual circumstances of a case, such as to afford the prisoner the opportunity to seek clemency or collateral review of his judgment of sentence. Otherwise, it contends, the Governor could circumvent the constitutional limitation on commutations of sentence by issuing an indefinite reprieve in a capital case such as this one, thereby effectively commuting the death sentence to life imprisonment without the requisite unanimous written recommendation of the Board of Pardons. The Commonwealth finds support for its constitutional interpretation in the text of Article IV, Section 9, the historical circumstances surrounding its adoption, as well as current day case law. To the contrary, Governor Wolf and Williams proffer that the language in Article IV, Section 9 conferring reprieve power upon the chief executive has always been conspicuously unencumbered and that the historical principles embodied in the text and its subsequent practical application support a broad, rather than narrow grant of executive authority. Upon close examination, we agree with Governor Wolf and Williams.

Although the term "reprieve" is not defined in the Pennsylvania Constitution, it is notable that at the time the reprieve power was adopted in 1790, the framers enacted the Governor's clemency powers with reference to English common law. Smithers & Thorn at 87 (stating that the Governor's clemency power "embraces all those grounds upon which by the English Common Law the courts granted reprieves"). At that time, a reprieve was commonly understood to mean "the suspension, postponement or delay of a sentence" or "a temporary respite." Id. at 67-68. A reprieve was similarly described as follows:

The term reprieve is derived from reprendre to keep back, and signifies the withdrawing of the sentence for an interval of time, and operates in delay of execution. It is granted either by the favour of his majesty himself or the judge before whom the prisoner is tried on his behalf, or from the regular operation of law in circumstances which render an immediate execution inconsistent with humanity or justice.

1 Chitty, Joseph, *A Practical Treatise on the Criminal Law* 522 (1819).

As espoused by the Governor, there appears to have been three general categories of reprieves at English common law, two of which were granted by the judiciary, either by the exercise of discretion based on the circumstances of the case (*ex arbitrio judicis)* or by operation of law (*ex necessitate legis)* if the convicted prisoner was pregnant or insane. The final category encompassed reprieves granted by the Crown itself (*ex mandatory regis)*, which, while temporary, were unburdened by specific restrictions as to duration or scope. As Smithers and Thorn explained in their *Treatise on Executive Clemency in Pennsylvania*:

While every reasonable safeguard has been thrown about the great prerogative through the constitutional restriction upon the governor as to pardons and commutations, there is no limitation upon the number or nature of reprieves he may grant. His power embraces all those grounds upon which by the English Common Law the courts granted reprieves, such as *ex arbitrio judicis*, where the judge was not satisfied with the verdict, and *ex necessitate legis*, such as pregnancy of a woman convict, or insanity. It also embraces the reprieve *ex mandatory regis*, which anciently was an expression of the Crown's will to the trial court. In Provincial times both the court and the governor exercised the right but the latter seems to have been bound by no technical rules and reprieved indefinitely or on condition.

*Smithers and Thorn*, at 78.

As Governor Wolf notes cogently, the PDAA, advocating in support of the Commonwealth, is incorrect in asserting that a reprieve at English common law had substantive limits and could only be exercised for reasons specific to the convict. The PDAA's argument in this regard focuses only on the reprieve powers held by judges at

English common law. The existence of limitations attendant to the judicial reprieve power does not establish that the Crown lacked the power to reprieve or that the Crown's authority to reprieve was somehow restricted to the reasons offered by the court when issuing a judicial reprieve.

We conclude that at the time the reprieve power was adopted in the 1790 Constitution, the Governor's authority to issue a reprieve was not understood as being limited to granting reprieves with a specific end date or for a purpose relating only to the prisoner's unique circumstances, but rather encompassed any temporary postponement of sentence. The Oregon Supreme Court in Haugen, supra, reached the same conclusion when it relied on English common law to reject a similar argument that a reprieve under that state's constitution had to be issued for a particular reason with a definitive termination date.[16] The Haugen court stated, "[a]lthough . . . several recurring reasons tended to be the reason for granting reprieves [in English common law], nothing suggests that an act of clemency had to be granted for one of those historical reasons to qualify as a reprieve," and "nothing suggests that reprieves were required to carry a stated end date." Haugen, 306 P.3d at 603.

We find that the historical exercise of executive reprieve power in Pennsylvania is also consistent with the common law understanding of the term and suggests no limitations as to fixed duration or particular purpose, but only that the reprieve operate as a temporary suspension of a sentence. While the Commonwealth characterizes executive reprieves unaccompanied by fixed duration or particular purpose as aberrations, both parties acknowledge that Governors, throughout the years, have

---

[16] As referenced, Article V, Section 14 of the Oregon Constitution provides that the Governor "shall have the power to grant reprieves, commutations, and pardons, after conviction, for all offences except treason, subject to such regulations as may be provided by law." ORE. CONST. art. V, § 14.

issued temporary reprieves that were not tethered to a specific end date or granted for the express reason of affording the prisoner an opportunity to seek further clemency or collateral relief.

Further, a review of the evolution of Article IV, Section 9(a) establishes that the broad grant of executive reprieve power has never been constitutionally altered or restricted, while the executive clemency powers of pardon and commutation have been significantly constrained by subsequent constitutional amendments. The citizens of Pennsylvania in 1790 reposed in their newly empowered chief executive, *i.e.*, the Governor, the virtually unconditioned executive "power to . . . grant reprieves and pardons, except in cases of impeachment." PA. CONST. of 1790, art. II, § 9. In the Constitution of 1874, the people left the reprieve power unchanged, but conditioned the Governor's clemency powers of pardon and commutation of sentence on the approval of enumerated executive officials. See PA. CONST. of 1874, art. IV, § 9. In 1968, the citizens of the Commonwealth amended the constitution, again making no change to the Governor's broad reprieve power, but limited the pardon and commutation executive power by creating and constituting the Board of Pardons and adding the proviso that "no pardon shall be granted, nor sentence commuted, except on the recommendation in writing of a majority of the Board of Pardons, after full hearing in open session, upon due public notice . . . ." See PA. CONST. of 1968, art. IV, § 9(a). Finally, in November of 1997, the people amended Article IV, Section 9, enunciating the text as it exists today, again leaving intact the Governor's expansive reprieve power. The 1997 amendment once more restricted the pardon and commutation power regarding "a sentence of

death or life imprisonment" by requiring a unanimous recommendation of the Board of Pardons, rather than a mere majority recommendation.[17]

Upon review of the various constitutional amendments to the Governor's clemency powers, we conclude that Article IV, Section 9 provides no textual predicate for the Commonwealth's assertion that the drafters and ratifying voters intended the amendments to the pardon and commutation provisions to apply to the Governor's reprieve power. Such intent to constrain the Governor's constitutionally granted authority must be established, either expressly or implicitly, by the constitutional language itself, which imposes no such restrictions. In fact, Pennsylvania's broad executive reprieve power in Article IV, Section 9(a) is in stark contrast to other state constitutional provisions that impose express temporal and substantive limitations on a Governor's exercise of reprieve authority. See e.g. TEX. CONST. art. IV, § 11(b) (conferring upon the Governor the power to grant one thirty-day reprieve in a capital case absent approval for longer reprieves from the Board of Pardons); NEV. CONST. art. V, § 13 (providing that except in cases of impeachment, the Governor shall have the power to grant reprieves for a period not exceeding sixty days from the time of conviction); IOWA CONST. art. IV, § 16 (conferring upon the Governor the power to grant reprieves subject to regulations as provided by law and requiring the Governor to report to the Legislative Assembly at its next meeting each case of reprieve and the reasons for granting the same).

Gleaning from the commonly understood meaning of the term at English common law, the text of Article IV, Section 9, and the historical application of the executive reprieve power, we hold that the term "reprieve" as set forth in Article IV,

---

[17] The clemency powers of pardon and commutation were also altered by changing the composition and term of gubernatorial appointees to the Board of Pardons.

Section 9(a) means the temporary suspension of the execution of a sentence. We find no limitation on the executive reprieve power relating to the duration of the reprieve, so long as it is temporary in nature and operates only for an interval of time. Additionally, we find no support for the proposition that the Governor must provide a particular explanation for his reprieve for it to be constitutionally sound. While reprieves have routinely been granted to provide a convicted prisoner with an opportunity to seek clemency or post-conviction collateral relief, and, thus, expire upon the conclusion of the event for which the execution was stayed, there is no requirement in the Pennsylvania Constitution or relevant case law requiring that to occur in every case on pain of judicial intervention. See Commonwealth v. Michael, 56 A.3d 899, 903 (Pa. 2012) (*per curiam*) (recognizing generally that Article IV, Section 9(a) of the Pennsylvania Constitution entrusts clemency decisions to the sole discretion of the executive branch).

Our holding in this regard does not conflict with the Commonwealth Court's decision in Morganelli v. Casey, supra. In that case, Governor Robert Casey filed a motion to open a peremptory judgment entered by the Commonwealth Court, which had granted mandamus relief to the Commonwealth in the form of ordering the Governor to sign death warrants in two capital cases that had been certified by this Court as complete and that had been pending before the Governor for several years with no warrants signed. In support of his inaction, the Governor argued, *inter alia*, that his executive reprieve power afforded him the authority to decline to sign the warrants. The Commonwealth Court rejected this argument, holding there is no such thing as a silent reprieve.

In discussing the Governor's general power to grant reprieves, the Morganelli court stated, "[i]f any governor desires to relieve a defendant from the prospect of execution of sentence, that executive should do so, presumably for an expressed

reason and for a defined time period. The executive cannot reserve an option ultimately to describe years of inaction, retroactively, as a reprieve." Id. at 747. The Morganelli court's reference that "presumably" the Governor should reprieve "for an expressed reason and for a defined time period" was not germane to the holding of the case, and, thus, constitutes *dicta* espoused by a lower tribunal*,* which in no way governs disposition of the constitutional issue presented here.

Applying such law to the facts before us, we conclude that the reprieve issued by Governor Wolf to Williams is constitutionally sound. By its express terms, the executive directive identifies the action as a "temporary reprieve of the execution unto Terrance Williams until [the Governor has] received and reviewed the forthcoming report of the Pennsylvania Task Force and Advisory Committee on Capital Punishment, and any recommendations contained therein are satisfactorily addressed." See Governor Wolf's Reprieve to Terrance Williams dated February 13, 2015. Governor Wolf has acknowledged that Williams has been convicted of first degree murder, that his sentence of death has been affirmed by this Court, and that Williams remains on death row under sentence of death. For this reason, we disagree with the Commonwealth's suggestion that the reprieve unconstitutionally altered a final judgment of this Court; rather, the execution of the judgment is merely delayed.

Contrary to the Commonwealth's assertions, the reprieve at issue is not divested of its "temporary" nature and automatically deemed "permanent" merely because it is unclear precisely when it will expire. The instant facts illustrate this point. Here, Governor Wolf issued the reprieve on February 13, 2015, indicating that it will continue until the Task Force's report is issued and any concerns raised therein are addressed. The Commonwealth initiated an action in this Court five days later, seeking to invalidate the reprieve as unconstitutional. At this time, when the Task Force report has yet to be

issued, we cannot conclude as a matter of law that the effect of the reprieve is to permanently suspend Williams' sentence.

This Court appreciates that the crux of the Commonwealth's argument is that the terminating event can never occur. This claim cannot be sustained, however, as it presumes that the Task Force report will reveal a constitutional infirmity in all capital proceedings, which renders Williams' death sentence invalid and requires the Governor to take some remedial action. Such a legal presumption is inappropriate. The triggering event rendering the reprieve temporary is well-defined and is capable of coming to fruition. It is beyond the purview of this Court to surmise that future action taken by Governor Wolf, if any, would encroach upon our judicial authority. Accordingly, we agree with Governor Wolf and Williams that the reprieve issued is, in fact, a temporary suspension of sentence and not a commutation.[18]

Because we view Governor Wolf's reprieve as a temporary suspension of Williams' sentence of death, pending a triggering event that has yet to occur, it does not violate Article I, Section 12.[19] Similarly unpersuasive is the Commonwealth's contention that by issuing the reprieve to Williams, Governor Wolf abrogated his duty to "take care that the laws be faithfully executed" pursuant to Article IV, § 2 of the Pennsylvania Constitution. As detailed at length, rather than an abrogation of constitutional duty,

---

[18] In post-submission communications filed in this Court, which we grant leave to address, the parties debate whether Governor Wolf's reprieve should alternatively be deemed temporary based upon the ground that the reprieve is limited by the length of his term in office, considering that a future chief executive could rescind the reprieve. While we agree that Governor Wolf would have no means of ensuring the continued vitality of Williams' reprieve after his term of office concludes, we decline to resolve the case on that ground.

[19] As noted, Article I, Section 12 provides that "[n]o power of suspending laws shall be exercised unless by the Legislature or its authority." PA. CONST. art. I, § 12.

Governor Wolf's reprieve is better characterized as a valid exercise of constitutional authority.

Finally, we emphasize that it is not our task to address the wisdom of Governor Wolf's issuance of Williams' reprieve, but only its constitutional validity. Significantly, we further decline to address the propriety of Governor Wolf's declaration in a press release that the issuance of a reprieve to Williams constitutes the first step in his executive policy of imposing a moratorium on the death penalty in Pennsylvania. While the Commonwealth relies on the Governor's statements in this regard to support its constitutional challenge, it cannot be ignored that the matter before us involves the constitutional validity of the reprieve issued to Williams. Future challenges to reprieves granted by Governor Wolf will have to await independent examination based upon our holdings herein.

It is for these reasons that we deny the Commonwealth's challenge to the validity of the February 13, 2015 reprieve issued to Williams.

Mr. Chief Justice Saylor, Mr. Justice Eakin and Madame Justice Todd join the opinion.

Mr. Justice Stevens files a concurring opinion.